ATLANTIC MUTUAL INSURANCE
COMPANY, Plaintiff,

v.

Dennis J. McMAHON, Individually and
as former Collector of Internal Revenue, Second District, New York, Defendant.

United States District Court
S. D. New York.
July 12, 1957.

Whitman, Ransom & Coulson, New York City, for plaintiff, James K. Polk, New York City, of counsel.

Paul W. Williams, U. S. Atty., New York City, Morton S. Robson, New York City, of counsel, for defendant.

DAWSON, District Judge.

In this action for a refund of income taxes, both parties have moved for summary judgment. It is not disputed that plaintiff overpaid its 1950 income tax in the sum of $211,274.95, which is the amount the plaintiff now claims. The Government contends, however, that suit for refund is barred by the provisions of

§ 322(b) (2) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 322(b) (2) (A),[1] which provides that the amount of refund shall not exceed the portion of the tax paid during the three years immediately preceding the filing of the refund claim. The Government contends that any amount of tax paid by the taxpayer was paid more than three years preceding the filing of the claim for refund.

It appears that the following facts exist without substantial controversy:[2]

1. Plaintiff is a mutual marine insurance company using the accrual method to compute income. It paid its tax on a calendar year basis.

2. Plaintiff's corporate income tax for the calendar year 1950 was due on March 15, 1951. At that time the method of reporting items of "losses incurred" by insurance companies was under discussion between the Commissioner of Internal Revenue and representatives of the insurance industry. Part of the controversy was settled and the method of filing returns determined when the Commissioner, on March 16, 1951, issued a Mimeograph (R.A.1819, T.S. 654) which substantially altered the method theretofore used for determining plaintiff's net income for tax purposes. Anticipating this change, but uncertain of its precise effect, plaintiff applied to the Collector of Internal Revenue for an extension of time to file its 1950 income tax return. A three month extension was granted on March 6, 1951 in a letter by the Collector, which conditioned extension on the filing by the taxpayer, on or about March 15, 1951, of a "tentative return" and the payment by that time of "30% of the estimated tax." The letter stated: "By a tentative return is meant a return on proper form, showing only the name and address of the taxpayer and estimated amount, if any, of the tax due."

3. The tentative return was filed by the plaintiff on March 15, 1951, showing only the name and address of taxpayer and the figure $600,000, representing the estimate of 1950 income tax liability. At the same time plaintiff transmitted to the Collector a check for $180,000, being 30% of the estimated tax. This estimate had been made by the plaintiff in accordance with its usual method of computing taxes, which however was considerably modified by the Mimeograph which was issued after the time the tentative return was filed.

4. As plaintiff had difficulty applying the procedures laid down in the Mimeograph it sought and received a further extension of time to file its final return to November 15, 1951. In connection therewith plaintiff remitted to the Collector on June 13, 1951 a check for an additional $180,000 based on the previous estimate which had been filed.

5. On November 15, 1951 plaintiff filed its final income tax return for the year 1950, showing the tax liability for that year to be $101,582.10. In 1953 the return was audited and a deficiency of $47,142.95 was asserted. Plaintiff consented to an immediate assessment of the deficiency.

6. It is admitted by the defendant that remittances of $180,000 each on March 13, 1951 and June 13, 1951 when received by the Collector were entered on the books of the Collector in a "suspense account" since no tax had at that time been assessed. In February 1953, after plaintiff filed its final return for 1950, an assessment was made. The as-

---

1. "§ 322. Refunds and credits
* * * * *
"(b) Limitation on allowance
* * * * * *
"(2) Limit on amount of credit or refund. The amount of the credit or refund shall not exceed the portion of the tax paid—
"(A) If a return was filed by the taxpayer, and the claim was filed within three years from the time the return was filed, during the three years immediately preceding the filing of the claim."

2. Basically, the facts in this case are not in dispute and the facts set forth in the affidavits submitted by the plaintiff are conceded." Brief for Government, p. 2.

sessment was for $101,582.10, the amount of tax liability shown in the final return. Plaintiff's liability for this assessment was satisfied by charging this amount against the $360,000 which had previously been credited to plaintiff in the suspense account. When the deficiency of $47,142.95 was disclosed in the audit in 1953 and plaintiff consented to an immediate assessment of this amount, this assessment was also satisfied by a charge to the balance remaining in the suspense account. Thus there had been deposited in the suspense account $360,-000 and two charges have been made against it, one of $101,582.10 and one of $47,142.95, leaving a balance of $211,-274.95 for which no assessment has been made. This is the amount of the claim for refund and the amount plaintiff seeks to recover in this action.

7. On August 12, 1954 plaintiff filed with the defendant a claim for this refund. This claim was rejected by the defendant on the ground that tax payments had not been made within three years immediately preceding the filing of the claim.

Since the $360,000 was remitted to the Government more than three years prior to the time the claim for refund was filed, the issue comes down to this: Was plaintiff's "tax paid," within the meaning of that term as used in § 322 (b)(2)(a), when it made remittance to the Treasury?[3]

At the time checks for $180,000 were received, no assessment had been made and no tax obligation definitively determined. However, some tax was indisputably owing and the remittance made by the plaintiff was obviously intended to satisfy its obligation pending a final determination of the proper amount of tax. Thus a persuasive argument can be made against the plaintiff that according to the most natural explanation of the transaction the tax was paid when the Government received the two checks totaling $360,000.

The cases are clear, however, that payment of money is not synonymous with the payment of tax: In Rosenman v. United States, 1945, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 the Supreme Court unanimously held, in regard to the statute of limitations on refunds, that money remitted to the Treasury prior to a determination of the amount of tax due did not constitute the "payment of tax," and that payment did not occur until the taxpayer's obligation was subsequently defined by assessment. This concept has been applied by the Court of Appeals for this circuit in ruling that for purposes of a loss "carryback" neither income nor excess profits taxes were paid when remittance was made to the Government. Lewyt Corp. v. Commissioner, 2 Cir., 215 F.2d 518, modified, 1955, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029. In the wake of Rosenman, many cases have applied this principle.[4] and in a recent case apparently on all fours with this one a refund claim has been held to be timely with the court ruling that the tax was not paid until a time subsequent to receipt of the taxpayer's remittance. See

3. The Code fails to define the acts rendering a tax paid. Section 322(b) (4) does, however, direct at what time early remittance shall be considered made: " * * * an advance payment of any portion of the tax made at the time such [early] return was filed shall be considered as made on the last day prescribed by law for the payment of the tax * * *. For the purposes of this paragraph, the last day prescribed by law for * * * paying the tax shall be determined without regard to any extention of time granted the taxpayer." This provision was primarily intended to

remove any incentive to pay just prior to a deadline; accordingly, early payment is deemed made at the due date. See H.R.Rep. No. 2333, 77th Cong. 2d Sess. 119 (1942); S.Rep. No. 1631, 77th Cong., 2d Sess. 156 (1942). Thus the Code partially defines when money, but not when a tax, is paid.

4. See, e. g., United States v. Dubuque Packing Co., 8 Cir., 1956, 233 F.2d 453; Roles v. Earle, 9 Cir., 195 F.2d 346, certiorari denied, 1952, 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637; Thomas v. Mercantile National Bank, 5 Cir., 1953, 204 F.2d 943.

Budd Company v. United States, D.C. E.D.Pa.1957, 148 F.Supp. 792.

To reconcile its position with Rosenman, the Government urges that the tentative return filed in March 1951 constituted a self-assessment and that remittance made pursuant thereto rendered the tax paid so as to commence the running of the statute of limitation. In development of this theme it is stressed that self-assessment, the initial computation of his tax and the filing of a return by each taxpayer, is a foundation stone of the income tax system. Emphasizing the self-assessment concept the Government suggests that Rosenman is not even relevant as in that case no return was filed to accompany the remittance.

Careful analysis of these contentions indicates to the Court that they must be rejected. Should the distinction urged by the Government be sound, then apparently the Supreme Court erred in Rosenman as the final return was filed on February 25, 1935; if the prior remittance rendered the tax paid at that time, then the 1940 claim for refund was more than two years tardy. A more fundamental weakness, however, adheres in the Government's position. Self-assessment is not a technical term of tax law, but merely a descriptive phrase colloquial in nature.[5] No basis in the statute or regulations has been cited to sustain the legal basis of the Government's self-assessment concept. Apparently none exists:

"The federal income tax system is frequently described as 'self-assessing.' The use of the term is misleading and is without statutory or other justification. The only statutory provision relating directly to the assessment of income taxes as distinguished from the assessment of deficiencies in income taxes is found in section 57 of the Internal Revenue Code [26 U.S.C.A. § 57] which provides that 'As soon as practicable after the return is filed the Commissioner shall examine it and determine the correct amount of the taxes.' Other provisions of the Code supplement this authority. None, however, confers any power upon the taxpayer to 'assess' his own taxes."

Sellin, Report on Procedures for Assessment and Collection of Federal Income Taxes, 5 Tax L.Rev. 487, 488 (1950).

The 1939 Code is clear that filing a return does not create an assessment:

Sec. 275(a). "General rule. The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period." 26 U.S.C.A. § 275(a).

Filing a return is preliminary to assessment.[6] The first assessment of tax, occurring in February 1953, was well within the period of limitation. Thus, if as the Government has urged, assessment is the crucial event, then the defense of the statute of limitation must be overruled.

One further observation is in order. The Supreme Court's decision in Rosenman is explicit that payment cannot oc-

5. See, generally, 9 Mertens, Federal Income Taxation § 49.02 (1943).

6. "Although the federal income tax return is often referred to as a method of self-assessment, the term 'assessment' is a technical one of great importance, referring to the action taken by the Commissioner of Internal Revenue under § 6201(a) (1) of the 1954 Code [26 U.S.C.A. § 6201(a) (1)]: 'The Secretary or his delegate shall assess all taxes determined by the taxpayer. * * *'

Pursuant to this and other authority, the Commissioner prepares an 'assessment list,' listing the names of taxpayers and the amounts of tax due. The assessment may be increased * * * should an audit indicate that the tax due exceeds the amount reported on the return. *The filing of a return by the taxpayer is thus the first step toward the assessment of tax.*" (emphasis supplied) Bittker, Federal Income Taxation, 784 (1954).

cur until the taxpayer's obligation is "defined." Definition and not assessment may well be the crux of the decision;[7] of course assessment is one method of defining the tax obligation. In any event, the facts of this case lead to the conclusion that the taxpayer's obligation for 1950 was not defined by the tentative return filed in March 1951. The tentative return showed merely the taxpayer's name, address and estimated liability. No other entries were required so that most of the blanks remained empty. While the amount of tax liability was approximated, this figure is too arbitrary to constitute a defined obligation. Apparently the chief function of this estimate is to serve as a basis for computing the 30% deposit accompanying the tentative return. In this regard the present action resembles Rosenman for there too the executor necessarily estimated the tax liability so as to make a proper payment prior to filing a return.

■ In a final attempt to distinguish Rosenman, the Government asserts two contentions, the first of which is that great significance must be attributed to the fact that remittance was there made under protest. While this circumstance was mentioned by the Supreme Court, it was not focused upon. Furthermore, the United States Court of Appeals for the Second Circuit, in ruling that a remittance did not constitute a tax payment, has minimized the relevance of subjective factors:

> "While we do not read Rosenman to foreclose treating as a tax payment any remittance made prior to assessment, we do think that it supports the view that a remittance which does not *satisfy* an asserted tax liability should not be treated as the 'payment' of a tax." Lewyt Corp. v. Commissioner, 1954, 215 F.2d 518, 522–523, modified, 1955, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029.

Accordingly, the absence of protest does not here render Rosenman inapplicable.

■ The last ground upon which the Government rests is a 1943 amendment to the Code. Section 3770(c), 26 U.S. C.A. § 3770(c), antedating the Supreme Court's decision in Rosenman but not applicable to the years there in litigation, provides:

> "*Rule where no tax liability.* An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid."

The Government construes this provision to mean that "[for statute of limitations purposes] a payment of an estimated tax is a tax payment despite the absence of an outstanding liability." Brief for Government, p. 19. The difficulty with this interpretation is that § 3770(c)'s legislative history is unequivocal that the amendment concerns only the allowance of interest on refunds; no mention is made of any application to the statute of limitations. See S.Rep. No. 221, 78th Cong., 1st Sess. 34 (1934); H.R.Rep. No. 510, 78th Cong., 1st Sess. 48 (1943). The amendment was intended to clarify that interest would be obtainable on a refund of a remittance made in good faith where no tax at all was payable, just as interest could be obtained on a refund where the remittance exceeded the tax payable. Not only was the amendment intended to relate to interest, its very terms preclude any other application. Section 3770(c) merely provides that a remittance can be an overpayment even though there is zero tax liability. The section does not declare at what time such remittance shall constitute an overpayment. United States v. Dubuque Packing Co., 8 Cir., 1956, 233 F.2d 453, 462. Thus this determination is left to the case law rule that a tax must be defined before it can be paid.

■ In conclusion, the Court finds that the March, 1951 tentative return failed to define the taxpayer's obligation,

---

7.  See United States v. Dubuque Packing Co., 8 Cir., 1956, 233 F.2d 453, 459–460.

so that there was no "tax paid" at either time remittance was made pursuant to the tentative return. Budd Co. v. United States, D.C.E.D.Pa.1957, 148 F.Supp. 792. Therefore, as of August 1951 there was no "tax paid" so that the refund claim of $211,274.95 filed August 14, 1954 was timely.

■ Plaintiff contends that it is also entitled to interest on this amount, to be computed from March 15, 1951 and June 13, 1951, respectively, the dates remittances were made to the Collector; or in any event that interest should run from November 15, 1951, the date of filing the final return.

The Code provision authorizes the payment of interest on an "overpayment."[8] To determine the date on which interest starts to run it is necessary to decide when the "overpayment" occurred. The overpayment did not occur when the original remittances were made, for at that time no tax had been determined and no assessment had been made.[9] The tax obligation did not become definite until February, 1953 when assessment was made. As of that time the Government had notice that there was more money deposited with it than was required for settlement of the tax liability; and if the Government retained the excess monies thereafter it reasonably could be expected to pay interest from that date. Thus in Rosenman v. United States, the Supreme Court wrote:

"Exaction of interest from the Government requires statutory authority, and it merely carries out the true nature of an arrangement such as this to treat it as an estimated deposit and not as a payment which, if in excess of what should properly have been exacted, entitled the taxpayer to interest as the return on the use that the Government has had of moneys that should not have been exacted." 1945, 323 U.S. 658, 663, 65 S.Ct. 536, 538.

Consistent with the decision in the Rosenman case the Court finds that the taxpayer is entitled to interest on the refund at the rate of 6% per annum from February, 1953.[10]

Judgment shall be granted for the plaintiff for $211,274.95 plus interest thereon at the rate of 6% per annum from February, 1953.

---

8. Sec. 3771(a) *"Rate.* Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the rate of 6 per centum per annum." 26 U.S.C.A. § 3771(a).

9. Section 3770(c) of the Internal Revenue Code of 1939 (as amended by § 4d of the Current Tax Payment Act of 1943) does not affect this decision. This section does not define the date upon which an "overpayment" is deemed to have been made. It merely provides that an amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was *no tax liability* in respect of such amount paid. In the present case there was a tax liability. The problem here presented is *when* was the tax liability determined and hence *when* was there a determination of overpayment so as to start the running of interest.

10. This result is consonant with the weight of authority indicating that interest accrues from the date the tax is paid, as prior to then there is no "overpayment." See Busser v. United States, 3 Cir., 1942, 130 F.2d 537; Manee v. United States, D.C.S.D.N.Y.1951, 97 F.Supp. 993. The Court of Claims, however, has held that interest accrues from the date of remittance. See Reading Co. v. United States, 1951, 98 F.Supp. 598, 120 Ct.Cl. 223.