**BANK OF KIMBALL, a Corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 1252 S. D.**

United States District Court
D. South Dakota, S. D.

Jan. 3, 1962.

Robert C. Heege, of Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., and John F. Lindley, Chamberlain, S. D., appeared in behalf of plaintiff.

Stephen H. Anderson, Dept. of Justice, Washington, D. C., appeared in behalf of defendant. (Harold C. Doyle, U. S. Dist. Atty. for Dist. of South Dakota, Sioux Falls, S. D., was with him on brief).

MICKELSON, Chief Judge.

This action was brought for a refund of certain federal income taxes for the years 1954, 1955, 1956, 1957 and 1958, in total amount of $20,524.51, which have been paid under protest by the

plaintiff, Bank of Kimball, hereinafter referred to as "taxpayer." Trial was had before the Court sitting without a jury.

The case is readily divisible into three issues, which we treat separately.

## I. EXISTENCE OF PARTNERSHIP ISSUE (1954 through 1956)

 Taxpayer is a banking corporation, duly chartered by the State of South Dakota, and conducts a successful banking business at Kimball, South Dakota, with a branch office at Pukwana, South Dakota.

In 1947, taxpayer purchased from one R. A. Johnson, for the sum of $1500.00, an insurance agency, and began to operate the same under the name of "The Bank of Kimball Agency." Insurance was sold by taxpayer through two of its employees, Fred M. Houda and H. O. Ekeland, both of whom were, and have continued to be, licensed by the State of South Dakota to sell insurance. It is undisputed that from the time taxpayer began to operate said insurance agency until January 9, 1951, the earnings from the sale of insurance constituted a portion of taxpayer's income and were treated as such by taxpayer. It is likewise undisputed that from 1957 to the present time, the earnings from the sale of insurance, as well as commissions for clerking auction sales, constituted income not to taxpayer, but to seven of its stockholders and directors, doing business as The Bank of Kimball Agency, a co-partnership.

During the tax years of 1951 through 1956, earnings from the sale of insurance and the auction sale commissions were treated by several of taxpayer's stockholders and directors as income to themselves, and were not treated as income by taxpayer. These stockholders and directors claim that they were operating such business as a partnership during those tax years. The Internal Revenue Service has assessed deficiencies against taxpayer, claiming that these earnings should have been reported as income by it for the years 1954, 1955 and 1956, the prior years of 1951, 1952 and 1953 being

beyond the reach of the Internal Revenue Service because of the statute of limitations. The taxpayer contends that "The Bank of Kimball Agency" partnership was formed in 1951 and that the disputed income was thereafter properly attributable to the claimed partnership as a separate entity, and not attributable to taxpayer.

In the minutes of a meeting of the Board of Directors of taxpayer dated January 9, 1951, is found the following paragraph:

"Motion made and carried that the commissions on all insurance, auction sales, and rental commissions, which does not constitute a direct banking profits be removed from the banks earnings for the coming year."

From the date of this motion hence, the receipts from the insurance and auction sale business have been channeled into special bank accounts, and the profits from such activities have been directly distributed among the seven alleged partners in proportions differing from the proportions of their stock ownership in taxpayer.

Whereas before 1951, profits from the sale of insurance and from the auction sales ultimately were channeled from a bank account labeled "Insurance Account" into the undivided profits account of taxpayer, a different procedure was adopted in 1951. Insurance and auction sale receipts, since 1951, have first gone into the "Insurance Account", and funds in such account representing profits have been diverted therefrom into a bank account entitled "Inactive Insurance Account", from which they have been distributed to the claimed partners. Also beginning in 1951, a slightly more complete set of insurance records was maintained by the licensed agents, Houda and Ekeland.

On December 9, 1956, a formal agreement was executed by and among the seven alleged partners, which agreement purported to set forth the terms of the claimed pre-existing partnership, and therein stated that such partnership had

been formed on January 9, 1951, by oral agreement. This 1956 agreement recited that the partnership would engage in the sale of insurance and the auction sale business under the name of "The Bank of Kimball Insurance Agency." Shortly thereafter, the same seven parties executed and filed a partnership "Fictitious Name Certificate" as required by SDC 49.08. Beginning in 1957, the "Bank of Kimball Agency" each year has filed a federal income tax partnership return.

Taxpayer now contends, having reference to the change in the method of distributing profits, the change in keeping records, and the statement in the 1956 agreement, that the Bank of Kimball Agency has been in existence since 1951, and that the disputed insurance and auction sale income was properly treated as the income of such partnership since such time. However, we do not find any convincing evidence that such partnership existed prior to the agreement dated December 9, 1956.

In the years from 1951 through 1956, as compared with prior years, no substantial changes occurred in the method of conducting the insurance and auction sale business. Such activities were performed on taxpayer's premises, by taxpayer's employees, using taxpayer's telephone, desks, typewriters and supplies. No sign indicating the presence of a business separate from taxpayer was erected either within or without the premises. The alleged partnership did not pay taxpayer rent, nor did it pay any share of the expenses of maintaining the premises or the equipment. No money changed hands in 1951 which could be construed as the purchase price of such a business (in prior years, taxpayer had enjoyed profits from the insurance business in the neighborhood of $6000.00 annually, and the witness Richard J. Smith, an experienced insurance man, testified that the price of an insurance agency is generally conceded to be one year's commissions). No written partnership agreement was made. There is no evidence in the record of a single meeting among the alleged partners. No "Fictitious Name Certificate" was filed. No capital contribution was made by the alleged partners. On the contrary, the alleged partnership began its operation on capital in the sum of $2056.56 belonging to taxpayer. No partnership income tax returns were filed. Most convincing is the fact that for many years subsequent to 1951, the date of the alleged formation of the partnership, taxpayer's Board of Directors, in their regular meetings, were passing motions governing the operations of the alleged partnership. In the face of such convincing evidence, we must conclude that no partnership was created in 1951, and, between 1951 and 1957, there existed no separate entity worthy of recognition for tax purposes to which the disputed income could be attributed.

Taxpayer points to the fact that profits from the insurance and auction sale business were not distributed pro rata among taxpayer's stockholders, but were distributed in different proportions, with the largest shares going to two men who did most of the insurance and auction sale work—Houda and Ekeland, two of the alleged partners. Such facts were established at the trial, but are not indicative of the alleged 1951 creation of a partnership. The testimony showed that in 1951, it became apparent to taxpayer that its two most active employees holding managerial positions—Houda and Ekeland—were not being adequately compensated for their services. Desiring to retain the services of Houda and Ekeland without raising their salaries, taxpayer evidently determined that its purpose could be accomplished by diverting to these two employees a greater share of the profits from the insurance and auction sale business, but there is no evidence that taxpayer relinquished its control over such business and the income therefrom.

Taxpayer attempts to fortify its stand with several cases, typical of which is Raymond Pearson Motor Co. v. Commissioner, 5 Cir., 1957, 246 F.2d 509. In that case, however, the partnership involved, which was engaged in the busi-

ness of financing the sales of cars by a corporation, possessed all the usual criteria of a separate entity, and had been created before the corporation had been formed. Other cases cited by taxpayer are similarly inapplicable. The recent case of Campbell County State Bank v. Commissioner, 37 T.C. No. 46, Docket Nos. 80064, 80065, involved a situation quite different from the present case in many respects. In that case, for example, the partnership which operated the insurance agency had been created by a formal written agreement, and the bank exercised no control over it.

We sustain the determination of the Internal Revenue Service that taxpayer should be assessed income tax on the profits from its insurance and auction sale business for the years 1954, 1955 and 1956.

## II. REALLOCATION OF EXPENSES ISSUE (1957 and 1958)

■ The Government has conceded, and the parties have stipulated, that a bona fide partnership was formed in 1957, and that the income from the insurance and auction sale business has since properly been treated as the income of The Bank of Kimball Insurance Agency, a partnership.

However, taxpayer has been denied, in part, for the years 1957 and 1958, several claimed deductions for business expenses. In support of such denial, the Government cites 26 U.S.C.A. § 482, which reads:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent eva-

sion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

On the authority of this section, certain expenses have been reallocated between taxpayer and The Bank of Kimball Insurance Agency for the years 1957 and 1958. Taxpayer disputes the propriety of this reallocation, and we must re-examine the record to determine this issue.

At all times, the insurance and auction sale business has been conducted on the premises of taxpayer. In 1957 and 1958, The Bank of Kimball Insurance Agency paid $100.00 per year rent to taxpayer. Although the greater part of such business has been conducted by Houda and Ekeland, other employees of taxpayer (not numbered among the partners of The Bank of Kimball Insurance Agency) have from time to time performed services contributing to the insurance and auction sale business, such as taking telephone calls, handling receipts on auction sale accounts, and assisting in clerking at some auction sales.

Taxpayer bought, and distributed to its customers, calendars on which was printed certain advertising, some of which pertained to the insurance business. Taxpayer made use of a postage meter, and there is evidence that The Bank of Kimball Insurance Agency posted 80 to 100 letters per month through taxpayer's postage meter. The Bank of Kimball Insurance Agency shared the telephone facilities of taxpayer, although the testimony indicated that few long-distance calls were charged to taxpayer by the insurance agency. Salaries paid by taxpayer to Houda and Ekeland, who spent considerable time working on insurance and auction sale business, do not appear to have been decreased due to that fact. Desks, typewriters and certain supplies belonging to taxpayer were used for insurance and auction sale work.

All of the foregoing expenses were borne by taxpayer and deducted by it on its corporate income tax returns. The only one of these items deducted by The

Bank of Kimball Insurance Agency is the $100.00 per year which it paid to taxpayer for rent. Considering all of the evidence, we believe that some reallocation was justified.

But taxpayer contends that the reallocation of which it complains was arbitrary, unreasonable, and contrary to the evidence. This contention must be sustained. The Internal Revenue Service computed such reallocation by a comparison of taxpayer's income with the income of The Bank of Kimball Insurance Agency, thereby arriving at a ratio, and applied that ratio to the deductions claimed by taxpayer, thus reallocating to the insurance agency about 12 to 14 per cent of the deductions claimed by taxpayer. This method, which is undeniably arbitrary, also leads to an unreasonable and inaccurate result. The evidence disclosed that the operations of the insurance agency did not require great outlays for operating expenses. Two small files sufficed for keeping most of its records. Both Houda and Ekeland worked only part-time on insurance agency business. Many of the supplies used by the insurance agency, such as envelopes and stationery, were furnished to it by the insurance companies with which it did business. The insurance agency occupied only a small portion of taxpayer's premises. The method of determining the reallocation of which taxpayer complains is not supported by the evidence.

█ We conclude that the reallocation made by the Internal Revenue Service is arbitrary, unreasonable, and contrary to the evidence, and must be reversed. Based upon a careful consideration of all of the evidence, we find that the expenses claimed by the taxpayer for the years 1957 and 1958 should be reduced in the amount of $750.00 for each of said years, and such amounts reallocated to the Bank of Kimball Insurance Agency. Although the evidence on this issue was not precise, and a certain amount of speculation is therefore unavoidable, our power to determine such issue is clear nevertheless. Cohan v. Commissioner of Internal Revenue, 2 Cir., 1930, 39 F.2d 540; Pleason v. Commissioner, 7 Cir., 1955, 226 F.2d 732.

III. DISALLOWANCE OF BONUSES ISSUE (1957 and 1958)

█ In the years 1957 and 1958, both Mrs. Bessie Drips and Mrs. Alice Beebe, members of the Board of Directors of taxpayer, received an annual bonus of $500.00 from taxpayer. These amounts were claimed by taxpayer as deductible expenses, but such deductions have been disallowed on the ground that such compensation was unreasonable for the services rendered.

The evidence shows that neither Mrs. Drips nor Mrs. Beebe had lived in the Kimball, South Dakota, area for many years prior to the years before the Court. Both were elderly, and neither attended as many as one-half of the directors' meetings held each of such years by taxpayer. It is a fair inference from their own depositions that neither of them contributed in any substantial degree to the direction of the business of taxpayer. Each was paid the regular director's fee of $25.00 plus traveling expenses for each meeting attended. Under these circumstances, we do not believe that the bonuses paid to these two directors were reasonable and necessary expenses to taxpayer.

We conclude that the deficiencies assessed against taxpayer due to the disallowance of these deductions were proper, and we deny the refund which taxpayer claims.

In each of the three issues which we have discussed, the burden of proof has been on the taxpayer. Taxpayer has failed to sustain its burden in each case with the exception of the issue pertaining to reallocation of expenses. Accordingly, the relief requested by taxpayer is denied, except that a refund shall issue to taxpayer in accordance with our findings in regard to the reasonable amount of reallocation of expenses for the years 1957 and 1958.

It has been stipulated by the parties that if the taxpayer prevails in all or any part of this action, the amount of tax to

be refunded shall be computed by the Internal Revenue Service and returned to the Court for entry in the final judgment. If the parties cannot agree on the correct amount, the Court shall retain jurisdiction to render a decision as to the amount, which will be included in the final judgment.

This memorandum decision shall stand as the Court's Findings of Fact and Conclusions of Law.

Counsel for the United States of America will prepare and submit to the Court, upon ten days notice to counsel for the taxpayer, a final judgment in accordance with this memorandum decision.