**FIRST SECURITY BANK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 2149.**

United States District Court
D. Montana,
Havre-Glasgow Division.

Jan. 22, 1963.

Thomas Dignan, Glasgow, Mont., and Hugh D. Galusha, Jr., Peter Meloy, and Robert C. Johnson, Helena, Mont., for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Fred J. Neuland, and Burton A. Schwalb, Dept. of Justice, Washington, D. C., and Moody Brickett, U. S. Atty., Butte, Mont.

JAMESON, District Judge.

Plaintiff seeks recovery of deficiencies in income taxes for the years 1952 to 1955, inclusive. Plaintiff is a bank incorporated under the laws of Montana. During the taxable years in question it operated at Glasgow, Montana, under the name of Farmers-Stockgrowers Bank. Its name was changed to its present form in 1957.

The primary questions presented are (1) whether plaintiff's stockholders created a partnership which operated an insurance business; and (2) if so, whether it was a partnership recognizable for tax purposes as an independent tax entity separate and apart from plaintiff. The facts are not essentially in dispute and many have been stipulated.

Plaintiff was incorporated in 1916 and has been engaged in the banking business continuously since that date. In 1942 its stock was purchased by a group of persons who are still, except for minor changes, the stockholders of the bank. After the purchase, it was discovered that one of the former stockholders had operated an insurance agency in connection with the bank. This business was taken over by the bank, although the insurance business was known as Farmers Stockgrowers Insurance Agency, and the insurance contracts and licenses were held in the names of two individual stockholders acting for the agency. It is admitted that from 1942 through 1945 the insurance business was operated by the bank, and that the bank was taxable on the income received from the insurance business during that time.

In 1944 or 1945 attorney stockholders [1] recommended the formation of a separate entity to conduct the insurance business, for the reason that it was apparently unlawful for the bank to engage in this business.[2] Subsequently officers of the plaintiff were also informed by representatives of various insurance companies that the bank could not itself sell insurance.[3]

1. O. R. Hauge, a lawyer-stockholder residing in Havre, Montana, testified that he had advised one of the stockholders at least as early as 1944 that the bank could not engage in the insurance business and that this business should be "separate and apart".

2. The Attorney General of Montana had rendered an opinion in 1935 that a state bank did not have power to act as an agent of fire insurance. Report of Opinions of Attorney General of Montana, Vol. 16 p. 197.

3. In 1946 a directive was issued by the Insurance Commissioner of Montana to insurance companies doing business in Montana to the effect that banks should not be engaged in the insurance business. In acknowledging notice from a special agent of one of the companies, C. H. Brocksmith, vice-president of plaintiff bank, wrote a letter dated September 3, 1947, reading in part:

"We acknowledge with appreciation the comment contained in your letter of August 25. We had already seen the circular put out by the Insurance Commissioner covering Bank Agencies but appreciate your thoughtfulness in sending a copy to us anyway.

"Our Agency, as you probably know, is not listed in the name of the Bank and the earnings of the Agency do not go to the Bank. This arrangement was established some time past and was not done with any thought of circumventing this present situation, however, it seems to take care of this present situation very nicely and I anticipate that we shall have no difficulty. * * *"

During the latter part of 1945 the stockholders consulted the bank's attorney and were advised that the bank could not legally operate the insurance agency. The attorney suggested the formation of either a partnership or separate corporation to operate this agency. The stockholders concluded to form a partnership. Articles of co-partnership were prepared by the bank's attorney and signed by all of the stockholders residing in Glasgow, including the attorney himself.

On December 26, 1946, C. H. Brocksmith, vice president of plaintiff, wrote O. R. Rubie, a stockholder residing at Havre, Montana, as follows:

> "We are getting ready to disperse the funds in the Farmers-Stockgrowers Insurance Agency and enclosed herewith are Articles of Co-Partnership prepared by Thomas Dignan. I suggest that you check it over carefully and if satisfactory have the various stockholders in Havre, sign it and return it to us. Likewise, any further suggestions or comments you may have on this deal would be appreciated."

This letter and the articles of co-partnership were taken by Rubie to O. R. Hauge, Havre attorney and stockholder. Hauge testified that he read the articles and made notations of the contents; that he and his wife signed the articles, and he then returned them to Rubie, with the understanding that Rubie would mail them back to Brocksmith. Brocksmith testified that the articles were not returned, but he first became aware of the fact that he did not have them when this tax question arose.[4] Another official of the bank went to Havre to ascertain whether Rubie had the articles. He did not get them from Rubie.[5] After Rubie's death, the same official made further inquiry of Rubie's sons, one of whom was executor of his father's estate, but did not obtain the written articles.

It is clear that the articles of co-partnership prepared by the bank's attorney were signed by all of the stockholders residing in Glasgow and by two of the stockholders residing in Havre, and that the signed articles were delivered to O. R. Rubie. As noted supra, Mr. Rubie is now deceased. It cannot be determined whether the articles were in fact signed by Rubie and other members of his family who were stockholders in the corporation.

The parties stipulated that during the years 1952 to 1955 all contracts with insurance companies and the state insurance licenses were executed in the name of "Farmers-Stockgrowers Insurance Agency", with "C. H. Brocksmith and J. E. Brown denominated as co-partners";[6] that a bank account was kept for the "agency" in plaintiff's bank; that the stockholders of the plaintiff shared in the proceeds from the insurance business in the same proportion as their stockholdings in the plaintiff bore to the total stock issued by plaintiff.

Partnership returns were filed by the agency, beginning in 1946 and continuing through the years in question, except for 1954.[7] Four stockholders testified that they were partners in a partnership composed of all of the stockholders of the bank, that the partnership operated the insurance business, and that the prof-

---

4. Brocksmith testified further:

"Q. Would you tell the court what you have done in order to try to find those articles of partnership?

"A. We have asked Mr. Rubie for them at various times, and he has made a very diligent search for them, but somehow they have been misplaced."

5. The court sustained defendant's objections to any questions relating to the conversation with Rubie.

6. During the years the bank itself operated the agency "the agency was in the name of J. E. Brown and C. H. Brocksmith". It does not appear from the record that they were then denominated "co-partners". In 1953 C. R. Tvedt was substituted for Brown.

7. The only explanation for the failure to file a return in 1954 was that it must have been an oversight. The bank's attorney testified that he prepared a partnership return in 1954 and delivered it to the bank to be signed and mailed.

its were distributed to the members of the partnership.

Plaintiff concedes that it has failed to prove that the articles of co-partnership were signed by all of the partners. It relies upon an oral agreement existing among the partners and argues that the evidence of the history of the written articles was submitted in corroboration of the other testimony, showing that a partnership did in fact exist. There is no question in my mind that the stockholders of the bank intended to create a partnership and understood that they were operating the insurance business as a partnership during the years in question.

No consideration was paid to the bank for the alleged transfer of the insurance business to the partnership, which earned in excess of $10,000 per year for each of the tax years in question. Nor was any so-called partner required to contribute either capital or services to the agency, but received his interest solely by reason of his stock ownership in the bank. Capital, however, is not an important requirement of an insurance agency. When certain stockholders died, the partnership was not formally dissolved, and the interest of the decedent stockholder in the agency passed to heirs or legatees with the bank stock.

A separate set of books was kept to reflect the business of the insurance agency. Correspondence and other communications relative to the insurance business were in the name of the partnership on stationery and forms bearing the agency name. Most of the stationery and other supplies were furnished by the insurance companies represented by the agency, and the balance by the bank.

Brocksmith, Brown and Tvedt handled the insurance business, which was conducted on the bank's premises. Often banking and insurance overlapped, e. g., persons coming in to talk banking also talked insurance and vice versa. Loans to finance premium charges were made regularly by the bank, as they were to insureds of other agencies. The only separate facilities of the insurance agency were a desk, files and the books, and these were furnished by the bank. The agency did not pay any of its expenses nor did it pay rent or a share of the bank's overhead. It had no separate telephone listing. There was no sign outside the bank showing that an insurance business was being carried on, but there was one inside the bank.

From time to time employees of the bank kept records or performed other services for the agency. Their salaries were paid by the bank. No salaries were paid by the agency, not even to Brown, Brocksmith or Tvedt. They received only their regular bank salaries and their proportionate share of the agency's earnings.[8]

Each year the bank filed its corporate tax return and deducted the entire amount of salaries, including salaries paid to persons who performed services for the agency, and also the expenses incurred in operating the agency, although they were not large. The agency did not deduct any of the expenses in its own tax return.

Funds of the agency were sometimes used in "participating" in loans in excess of the amount the bank itself could legally loan. While interest was paid to other "participants", no interest was paid the agency for the use of its funds.

All income from the insurance business was included in the partnership returns and no part of it in the bank's return. The net proceeds of the insurance business were distributed through checks drawn on the agency and mailed separately from any dividend checks mailed by the bank.

Eight stockholders, who were the directors of the bank, purchased the insur-

---

8. In explanation of the fact that all salaries during the years in question were paid by the bank, Brocksmith testified (1) that the partnership was a part-time operation, and (2) that the "bank was compensated from the additional benefits of having the agency located within the premises of the bank building".

ance business in 1956 or 1957 for $10,-500. This amount and the 1956 net proceeds of the agency were used by plaintiff to pay the tax deficiency. Subsequent to the sale, Brocksmith and Tvedt received 30% of the net proceeds of the agency, and their salaries as officers of the bank were reduced.

Defendant contends (1) that plaintiff has failed to prove that the stockholders did in fact form a partnership; and (2) that if the court finds that the stockholders did create a partnership which operated the insurance agency, the income from that agency is still taxable to the bank, since it was not a partnership recognizable for tax purposes as an independent taxable entity separate and apart from the plaintiff.

■ It is my conclusion that plaintiff has assumed its burden of showing that a partnership did in fact exist, whether or not the written articles of co-partnership were executed by all of the partners, and that the partnership did in fact operate the insurance agency during the years in question. We turn now to the critical issue, i. e., whether this partnership was recognizable as an independent entity for tax purposes.

In a different context, i. e., in determining whether members of a family were in fact partners, the Supreme Court held that the question was "whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise".[9] While not precisely in point, many of the factors considered in that case are applicable in determining wheth-er the partnership in this case is recognizable as a separate entity for tax purposes.

Factors supporting plaintiff's contention that the insurance agency was a separate entity for tax purposes include: (1) the existence of a partnership, whether or not the written articles of co-partnership were executed by all of the partners; (2) the regular filing of a partnership tax return, beginning with the year 1946, six years before the first tax year in question; (3) a bona fide business purpose for operating the insurance business as a separate entity and lack of any evidence of a tax avoidance purpose; (4) the maintenance of a separate bank account and separate set of books; (5) the carrying on of correspondence and other communications in the name of the partnership on stationery and forms bearing the agency name; and (6) the lack of control by plaintiff through any action of its board of directors.

Factors supporting defendant's contention that the partnership was not recognizable for tax purposes as a separate entity include: (1) common personnel (the agency had no full-time employees); (2) common premises, without the payment of any rent or overhead by the partnership; (3) the payment by plaintiff of the entire salaries of all bank officers and employees who devoted part of their time to the insurance business, as well as all other expenses of the agency; (4) the failure to pay any consideration for the transfer of the assets at the commencement of the operation as a partnership; (5) the participation by the agency in excess loans without the payment of interest by the bank; and (6) the distribution of profits in the same proportion as stock ownership.

■ Defendant argues also that there is no evidence to show compliance with the Montana law requiring the filing of a certificate of fictitious name.[10] Nor is there any evidence that it was not filed.

---

9. Commissioner of Internal Revenue v. Culbertson, 1949, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659.

10. R.C.M.1947, §§ 63–601 to 603.

In any event, the filing of the certificate is not a prerequisite to a valid partnership or engaging in business as a partnership. The disability imposed is limited to maintaining an action on an account or contract.[11]

The two cases most nearly in point factually are Campbell County State Bank, Inc. of Herried, South Dakota v. C. I. R., 1961, 37 T.C. 430,[12] and Bank of Kimball v. United States, D.C.S.Dak. 1962, 200 F.Supp. 638. Both involved the precise questions here presented, i. e., whether an alleged partnership was formed for the conduct of an insurance business apart from the business of the bank and whether it was recognizable as a separate entity for tax purposes. Campbell was decided in favor of the taxpayer and Kimball, in favor of the Government. The following table compares pertinent factors in these cases with the instant case:

| | Campbell | Kimball | Present Case |
|---|---|---|---|
| Agreement | Written agreement signed by all parties. | No written agreement. Later agreement recited formation at earlier date, but court found no partnership. | Oral agreement. Written agreement had been prepared and executed by majority of partners, but cannot be determined whether executed by others. |
| Partnership return | Filed. | Not filed. | Except for one year, filed regularly beginning 6 years before first year in question. |
| Control by bank directors | Partnership agreement provided that agency be directed and supervised by bank directors, but no record of any action by board after first year. | Board of directors passed motions governing operations of alleged partnership. | No action by bank board. |
| Unlawful for bank to engage in insurance business | Yes. | Presumably, but not considered by court. | Yes. |

---

11. The disability for failure to comply with the statute "cannot be of avail to the defendant except upon affirmative allegation and proof". Croft v. Bain, 1914, 49 Mont. 484, 489, 143 P. 960, 962. If the certificate is filed before answer, the action may be maintained, and the defense is waived unless pleaded. Reilly v. Hatheway, 1912, 46 Mont. 1, 11, 125 P. 417.

12. Reversed on other grounds 8 Cir., January 3, 1963, 311 F.2d 374. See discussion infra.

| | Campbell | Kimball | Present Case |
|---|---|---|---|
| Payment of salaries | Commissions paid to bank employees by agency, pursuant to resolution of bank directors fixing compensation of employees. | Commissions paid pursuant to motion of bank directors. | All paid by bank. |
| Rent | None paid by insurance agency. | None paid by agency. | None paid by agency. |
| Separate bank account | Yes. | Insurance receipts put in "insurance account" and funds representing profits diverted therefrom to "inactive insurance account" from which distribution made to claimed partners. | Yes. |
| Separate telephone listing | Yes, but paid by bank. | Not shown. | No. |
| Capital contribution by alleged partners | None. | None. | None. |
| Distribution of Income | Same proportion as stock ownership. | Different proportions, larger percentage to those active in insurance business. | Same proportion as stock ownership. |
| Agency formerly owned by bank | No, although insurance business of incorporator purchased for $375. Authorized by bank board and paid by bank check on insurance account. During first year bank in effect operated agency. | Yes. | Yes. |

|  | Campbell | Kimball | Present Case |
|---|---|---|---|
| Agreement re: sale | If shareholder sold stock, must sell interest in agency at book value. | None. | No restriction. In practice interest in partnership followed stock. In 1957, however, some of partners sold partnership interest without selling stock. |
| Payment of premium on bank policies | Paid by bank. | Not shown. | Not paid. |

In Bank of Kimball v. United States, supra, the Campbell County Bank case was found to involve "a situation quite different * * * in many respects. In that case, for example, the partnership which operated the insurance agency had been created by a formal written agreement, and the bank exercised no control over it". In the Bank of Kimball case the court found no "convincing evidence" that the partnership existed prior to an agreement dated December 9, 1956, although this agreement recited that the partnership had been formed on January 9, 1951, by oral agreement. No partnership income tax returns were filed between 1951 and 1956. "Most convincing" was the fact "that for many years subsequent to 1951, the date of the alleged formation of the partnership, taxpayer's board of directors, in their regular meetings, were passing motions governing the operations of the alleged partnership". In all of these respects the facts here are more nearly analogous to the Campbell County Bank case. Even though it is uncertain whether the written agreement was executed by all of the partners, as noted supra, the partnership did in fact operate the insurance agency during the years in question. It is my conclusion accordingly that the plaintiff bank and the insurance agency were separate entities for tax purposes and that plaintiff is entitled to recover the deficiencies assessed.

In the Campbell County Bank case the Commissioner had contended, as the Government does here, that under Section 482 of the Internal Revenue Code of 1954 [13] all of the net income of the agency should be allocated to the bank. In the alternative the Commissioner had determined that, if the net income of the insurance agency were not properly includable in the bank's taxable income, then certain expenses paid by the bank should be allocated to the partnership. The Government did not appeal the holding of the Tax Court that the bank and insurance agency were separate entities for federal tax purposes and that the Com-

---

13. Section 482 provides:
"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

missioner could not accordingly allocate to the bank all of the partnership's net income. The taxpayer, however, appealed that portion of the decision upholding, with minor adjustments, the Commissioner's allocation of expense items. In an opinion handed down on January 3, 1963, the Court of Appeals for the Eighth Circuit held that the reallocation made by the Commissioner and approved by the Tax Court was arbitrary and led to an unreasonable result.[14] The court concluded that "a basis exists for reallocation of some of the deductions claimed by the taxpayer to the insurance partnership, but that no reallocation should be made with respect to expenses exclusively attributed to the Bank". [15]

■ This case, as presented, does not involve an allocation of expenses pursuant to section 482. It would seem that a reallocation could properly have been made with respect to any items of expense which might under appropriate evidence "be reasonably considered expenses attributable to the insurance partnership". Campbell County State Bank v. C. I. R., 8 Cir., supra.[16]

Having found for the plaintiff, it becomes necessary to determine when interest began to run on the sum of $30,-000.00 deposited by plaintiff as an advance payment on February 4, 1958, before the final tax liability was defined. The statutory notice of deficiency was sent to plaintiff on June 24, 1958. On November 14, 1958, the sum of $36,980.24 was assessed against plaintiff. The $30,-000.00 deposit was applied against the assessment, leaving a balance of $6,980.-24, which was paid on March 5, 1959.

■ Plaintiff contends that it is entitled to interest on $30,000.00 from February 4, 1958, the date the deposit was made. Defendant contends that interest runs only from the date the advance payment or deposit was applied to a defined liability, i. e., November 14, 1958, the date of the assessment.

Under both the 1939 and 1954 Internal Revenue Codes, interest on overpayments is payable generally, "from the date of the overpayment" of the tax. § 3771(b), 1939 Int.Rev.Code, and § 6611(b), 1954 Int.Rev.Code, 26 U.S.C.A.; 10 Mertens, Law of Federal Income Taxation § 58.48.

In Rosenman v. United States, 1945, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535, the court recognized that payments prior to assessment are treated by the Government as "deposits" and not as "payments" of taxes duly collected. The court there held that the taxpayer was not

---

14. The court said in part: "The Tax Court made no attempt upon the basis of the evidence to compute the portion of the various Bank deductions properly attributable to the insurance partnership. Instead, it adopted the method of computation or formula provided by the Commissioner and allocated a portion of all of the deductions claimed by the Bank to the insurance partnership."

15. In Bank of Kimball v. United States, supra, the reallocation made by the Commissioner (with respect to years where it was conceded that there was a bona fide partnership) was held to be "arbitrary, unreasonable, and contrary to the evidence". (200 F.Supp. at 642) This portion of the opinion was quoted with approval by the circuit court in Campbell County State Bank v. C. I. R.

16. Improper allocation of income and expense items between related entities does not require a finding that a separate entity does not in fact exist. In Campbell the two issues were distinguished by the Tax Court as follows:

"Where the close relationship between two organizations results in an improper allocation of income or expense items, the respondent's (Commissioner's) remedy is by way of reallocation. Any such improper allocation is is not, however, conclusive as to the issue of separate identity. See Abe Akerman, 27 B.T.A. 413 (1932), aff'd 76 F.2d 833 (C.A.7, 1935)."

\* \* \* \* \*

And further:

"The mere fact of lack of arm's-length dealing between two businesses may strongly suggest that income or expense items were not properly allocated between them, as regards Federal income taxes, but it is not sufficient to show that two separate businesses should be taxed as one entity."

barred from asserting its claim by the statute of limitations, saying in part:

"If it is not payment in order to relieve the Government from paying interest on a subsequently determined excess, it cannot be payment to bar suit by the taxpayer for its illegal retention. It will not do to treat the same transaction as payment and not as payment, whichever favors the Government. See United States v. Wurts, 303 U.S. 414 [58 S.Ct. 637, 82 L.Ed. 932].

"Exaction of interest from the Government requires statutory authority, and it merely carries out the true nature of an arrangement such as this to treat it as an estimated deposit and not as a payment which, if in excess of what should properly have been exacted, entitled the taxpayer to interest as the return on the use that the Government has had of moneys that should not have been exacted." (323 U.S. at 663, 65 S.Ct. at 538) [17]

Relying in part upon Rosenman v. United States, supra, it was held in the recent and well considered case of Miller v. United States, 1962, D.Wyo., 202 F. Supp. 650, that a deposit does not constitute payment which commences the running of interest. The court said in pertinent part:

"The payment of money is not identical to the payment of tax. Rosenman et al., Executors v. United States, supra; Atlantic Mutual Insurance Company v. McMahon, S.D. N.Y.1957, 153 F.Supp. 48. The

words 'payment' or 'paid' are not words of art. They are used in every day parlance as money given to discharge a debt or obligation. In the absence of any evidence of a determined income tax obligation, the only conclusion possible under the facts before me is that the remittances were voluntarily made as deposits to be utilized by the government in the event a tax obligation were subsequently defined and imposed. If no tax liability is satisfied in whole or in part by the taxpayers' remittances they should not be processed as payments of a tax.

\* \* \* \* \* \*

"\* \* \* Interest accrues from the date of payment of the tax obligation. Atlantic Mutual Insurance Company v. McMahon, supra, and cases cited therein. A voluntary deposit to be held by the government in the eventuality that a tax obligation may be ascertained does not amount to a payment which would entitle taxpayers to the recovery of interest on their money so deposited. Manee et al. v. United States, S.D. N.Y., 1951, 97 F.Supp. 993."

While there are authorities which tend to support a contrary conclusion,[18] I am persuaded that the reasoning of Miller v. United States is sound and should be followed. Accordingly I conclude that interest on the sum of $30,000.00 began to run on November 14, 1958.

The plaintiff will prepare, serve and lodge findings of fact, conclusions of law and draft of judgment, pursuant to Rule 11 of the Local Rules of Court.

---

17. In United States v. Dubuque Packing Company, 8 Cir. 1956, 233 F.2d 453, the court followed the Rosenman case and held that transfers of money in anticipation of further assessments did not have the status of payments until tax deficiencies were formally assessed by the Commissioner. See also Thomas v. Mercantile Nat. Bank at Dallas, 5 Cir., 1953, 204 F.2d 943; Atlantic Mutual Insurance Company v. McMahon, S.D. N.Y.1957, 153 F.Supp. 48.

18. See Reading Co. v. United States, 1951, 98 F.Supp. 598, 120 Ct.Cl. 223; Atlantic Oil Producing Co. v. United States, 1940, 35 F.Supp. 766, 92 Ct.Cl. 441; and cases cited in accord 10 Mertens, Law of Federal Income Taxation, § 58.46 note 58.