LOCAL FINANCE CORPORATION, ET AL.,* PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1693-65—1703-65. Filed August 31, 1967.

---

*Cases of the following petitioners are consolidated herewith : Local Finance Corp. of South Marion, docket No. 1694-65 ; Local Finance Corp. of Elkhart, docket No. 1695-65 ; Local Finance Corp. of Gas City, docket No. 1696-65 ; Local Finance Corp. of Rushville, docket No. 1697-65 ; Local Finance Corp. of Danville, docket No. 1698-65 ; Local Finance, Inc., docket No. 1699-65 ; Local Finance Co., Inc. of Gary, docket No. 1700-65 ; Local Finance Co., Inc., docket No. 1701-65 ; Guardian Agency, Inc., docket No. 1702-65 ; and Beneficial Insurance Agency, Inc., docket No. 1703-65.

*Max E. Meyer, Stephen A. Milwid, Wilbur S. Legg,* and *John K. O'Connor,* for the petitioners.

*Dennis J. Fox,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in the petitioners' income tax as follows:

| Docket No. | Petitioner | Taxable year | Deficiency | Docket No. | Petitioner | Taxable year | Deficiency |
|---|---|---|---|---|---|---|---|
| 1693-65 | Local Finance Corp | 1958 | $60,190.09 | 1699-65 | Local Finance, Inc | 1958 | $2,251.89 |
|  |  | 1959 | 56,492.22 |  |  | 1959 | 3,354.15 |
|  |  | 1960 | 75,958.84 |  |  | 1960 | 4,406.10 |
|  |  | 1961 | 65,136.00 |  |  | 1961 | 3,172.00 |
|  |  | 1962 | 67,582.00 |  |  | 1962 | 4,108.00 |
| 1694-65 | Local Finance Corp of South Marion | 1961 | 2,724.00 | 1700-65 | Local Finance Co., Inc. of Gary | 1958 | 394.79 |
|  |  | 1962 | 773.00 |  |  | 1959 | 1,890.14 |
| 1695-65 | Local Finance Corp of Elkhart | 1959 | 4,058.57 |  |  | 1960 | 1,269.58 |
|  |  | 1960 | 1,327.26 |  |  | 1961 | 234.00 |
|  |  |  | 380.68 |  |  | 1962 | 1,365.00 |
| 1696-65 | Local Finance Corp. of Gas City | 1958 | 529.61 | 1701-65 | Local Finance Co., Inc | 1958 | 4,341.05 |
|  |  | 1959 | 557.85 |  |  | 1959 | 10,253.35 |
|  |  | 1960 | 632.00 |  |  | 1960 | 15,742.90 |
|  |  | 1961 | 368.00 |  |  | 1961 | 11,392.00 |
|  |  | 1962 | 385.76 |  |  | 1962 | 13,416.00 |
| 1697-65 | Local Finance Corp. of Rushville | 1958 | 523.36 | 1702-65 | Guardian Agency, Inc | 1958 | 17,781.82 |
|  |  | 1959 | 690.55 |  |  | 1959 | 42,283.41 |
|  |  | 1960 | 604.00 |  |  | 1960 | 52,681.68 |
|  |  | 1961 | 669.00 |  |  | 1961 | 44,500.00 |
|  |  | 1962 | 175.57 |  |  | 1962 | 48,366.00 |
| 1698-65 | Local Finance Corp. of Danville | 1960 | 1,150.00 | 1703-65 | Beneficial Insurance Agency, Inc | 1958 | 4,297.21 |
|  |  | 1961 | 478.00 |  |  | 1959 | 18,097.12 |
|  |  | 1962 |  |  |  | 1960 | 20,120.50 |
|  |  |  |  |  |  | 1961 | 16,312.00 |
|  |  |  |  |  |  | 1962 | 19,026.00 |

The parties having agreed upon one of the issues in docket Nos. 1693–65 and 1701–65 and the respondent having conceded error with respect to one of the issues in docket No. 1693–65, the issues remaining for decision are (1) whether, for the period January 1 to June 30, 1958, the respondent erred in allocating to the petitioners in docket Nos. 1693–65 through 1701–65, pursuant to sections 61 and 482 of the Internal Revenue Code of 1954, a portion of the income reported by the petitioners in docket Nos. 1702–65 and 1703–65 as commissions on sales of credit life insurance, and (2) whether, for the period

July 1 to December 31, 1958, and for the taxable years 1959 through 1962, he erred in allocating to such petitioners a portion of the income reported by Grand National Life Insurance Co. as premiums for reinsurance of credit life insurance. In the alternative there is also the issue of whether, for such latter period and taxable years, such portion is allocable to the petitioners in docket Nos. 1702–65 and 1703–65.

FINDINGS OF FACT

Some of the facts were stipulated and the stipulations are incorporated herein by this reference.

The petitioners are corporations organized under the laws of the State of Indiana, having their principal offices at 333 West Fourth Street, Marion, Ind. They filed their Federal income tax returns for the taxable years involved herein on a calendar year basis with the district director of internal revenue, Indianapolis, Ind.

The petitioners Local Finance Corp. of South Marion, Local Finance Corp. of Elkhart, Local Finance Corp. of Gas City, Local Finance Corp. of Rushville, Local Finance Corp. of Danville, Local Finance, Inc., Local Finance Co., Inc. of Gary, and Local Finance Company, Inc., are wholly owned subsidiaries of Local Finance Corp. (hereinafter called Local Finance). Collectively, Local Finance and its subsidiaries will sometimes be referred to as the finance companies.

During the years in question, the finance companies were engaged in the business of making small loans. Local Finance and its five subsidiaries at South Marion, Elkhart, Gas City, Rushville, and Danville were licensed under the Indiana Small Loan Act [1] and the Indiana Retail Installment Sales Act.[2] The other three finance company petitioners were licensed under the Indiana Industrial Loan and Investment Act.[3] The greater dollar volume of business of the finance companies collectively was derived from loans made, at the maximum rate of interest permitted, under the Indiana Small Loan Act. Under that Act the loan to any one borrower was limited to $500. The finance companies making loans under the Indiana Industrial Loan and Investment Act voluntarily limited their loans to $1,000 to any one borrower.

The petitioner Guardian Agency, Inc. (hereinafter referred to as Guardian), was formed in 1936 as a general insurance agency and broker to provide fire and casualty insurance coverage on property given as security to the finance companies by their debtors, and the finance companies were virtually the entire source of its fire and casualty business. In the years in question stockholders who owned

---

[1] Ind. Ann. Stat. secs. 18–3001 through 18–3005 (1964).
[2] Ind. Ann. Stat. secs. 58–901 through 58–945 (1964).
[3] Ind. Ann. Stat. secs. 18–3101 through 18–3125 (1964).

in excess of 70 percent of the stock of Local Finance also owned 100 percent of the stock of Guardian.

The petitioner Beneficial Insurance Agency, Inc. (hereinafter referred to as Beneficial), is the wholly owned subsidiary of Guardian, having been acquired by Guardian in 1956, and was engaged in the same business.

None of the petitioners has ever been authorized in writing by any life insurance company to act as an agent in connection with the writing or selling of any life insurance policies, nor has any been licensed by any State as a life insurance agent. Section 39–4608 of Burns Indiana Statutes Annotated provides that no corporation shall act in Indiana as an agent for a life insurance company and that no life insurance company shall pay a commission to any person who is not entitled to act as agent.

In connection with, and as an incident to, the loans made by the finance companies, credit life insurance was offered to their debtors for a term which was coextensive with the contractual term of the related indebtedness. The finance companies did not require that their debtors take out credit life insurance, but in the years involved 85 percent to 95 percent of them did so. Since before 1936 the finance companies have offered credit life insurance to their borrowers for several business and economic reasons, including the following: (1) Their competitors generally offer credit insurance, (2) the insurance is an important factor in obtaining repayment of the loans, and (3) collection on the insurance policies, rather than collection from a coobligor (usually the obligor's spouse) is more favorable to public relations.

Credit life insurance, as referred to herein, is single-premium term insurance on the life of a debtor in an amount at least sufficient to discharge the debt in case of the debtor's death. Such insurance may be written on either an individual or a group policy basis. In the former case the debtor is the policyholder, and the creditor is the first beneficiary, while in the latter case the creditor is the policyholder as well as first beneficiary. Also, two types of coverage are generally provided under credit life insurance: (1) Decreasing term coverage, under which the amount of the death benefit decreases during the policy term coincidentally with the decrease in the amount of the debt under the applicable installment payments schedule; and (2) level term coverage, under which the amount of the death benefit remains constant during the policy term.

Since January 1954 the credit life insurance issued to all but an insignificant number of debtors of the finance companies was single-premium decreasing-term insurance, written on an individual policy basis. The single premium was paid at the inception of the coverage.

After World War II it became common practice for life insurance companies to pay compensation for credit life insurance sold to debtors of lending institutions. Such compensation consisted of a commission equal to a fixed percentage of the premium charged, and sometimes, in addition, a contingent commission based upon the insurer's later determined loss ratio. Where the insurance was issued pursuant to a group policy held by the lending institution such contingent commissions were paid in the form of retroactive premium adjustments. Later, a practice was adopted by some lending institutions whereby the lending institution would form a life insurance company in a State where capital requirements for insurance companies were low and have such company reinsure the risks to the original insurer and receive reinsurance premiums.

Prior to January 1954, Lincoln National Life Insurance Co. (hereinafter called Lincoln) issued the credit life insurance sold to debtors of the finance companies. This insurance was issued under a group policy held by Local Finance. Lincoln paid a percentage commission on this business. The commissions were paid to Guardian, rather than to Local Finance, because Local Finance had been advised by its attorney that it could not accept any commissions or income from the insurance business since Indiana law precluded small loan companies from receiving any income other than from small loan interest.[4] As the volume of such insurance increased an arrangement was made whereby Lincoln would pay contingent commissions (retroactive premium adjustments) over and above the percentage commissions already being paid to Guardian. Lincoln insisted that such contingent commissions would necessarily have to be paid to Local Finance as the policyholder. One check for such contingent commissions was issued to Local Finance.

---

[4] During the years in question sec. 18–3002 of Indiana Statutes Annotated (Small Loan Act) provided in part:

> In addition to the rate of interest or charges herein provided for no further or other charge or amount whatsoever for examination, service, brokerage, commission, expense, fee, or bonus or other thing or otherwise shall be directly or indirectly charged, contracted for, or received, except the lawful fees, if any, actually and necessarily paid out by the licensee to any public officer for filing, recording, or releasing any instrument securing the loan in any public office, which fees may be collected when the loan is made, or at any time thereafter. If any interest, consideration or charges in excess of those permitted by this act are charged, contracted for or received the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest, or charges whatsoever.

Sec. 18–3004 provided in part:

> Any licensee and any person acting as an officer or employee of a licensee, who shall violate any of the provisions of section 2 [§ 18–3002] of this act shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than five hundred dollars [$500] or by imprisonment of not more than six [6] months or by both such fine and imprisonment in the discretion of the court.

Sec. 18–3001 provided that a license may be revoked if, among other things, the licensee has violated any provision of the act or any rule or regulations lawfully made thereunder.

The Indiana Industrial Loan and Investment Act and the Indiana Retail Installment Sales Act also made provision for the fixing of maximum interest or charges and provided certain penalties in the event of violations of the Acts or any regulations thereunder.

Local Finance, for the same reason stated above with respect to the percentage commissions, felt that it should not accept these contingent commissions. Lincoln was willing to pay the contingent commissions to Guardian if Local Finance would execute an assignment of the commissions to Guardian, but Local Finance was not satisfied that such an arrangement would be a satisfactory solution to the problem. It approached other credit life insurers, including Old Republic Life Insurance Co. of Chicago, Ill. (hereinafter called Republic), a company which was not affiliated with the petitioners in any way.

On January 4, 1954, Don H. Miller, who was an officer of each of the finance companies and of Guardian, executed an agreement with Republic which provided that Miller was to be Republic's agent for soliciting credit life insurance on the lives of debtors of the finance companies. It was provided that the insurance to be written should be single-premium decreasing-term insurance written on an individual policy basis, that the amount of insurance in any case should not exceed $500 on any one life, and that the insurance should be written only on the lives of persons who were 65 or under and who appeared to be in sound health and were actively employed. The premium charged by Republic was $1 per year per $100 of coverage, which was the rate which had been charged by Lincoln and was the rate commonly charged in the credit life insurance industry in Indiana.[5] In fixing its rates for credit life insurance Republic took into account the expected mortality costs, the administration expenses, the direct acquisition costs (which included principally any commissions paid for generating the business), and a profit margin. Local Finance selected Republic as the insurer because Republic was willing to retain less of the premiums than another insurer which Local Finance was considering.

In the above agreement Republic agreed to pay Miller a guaranteed commission of 40 percent of the premiums collected plus, at 3 month intervals, an additional commission equal to the balance of premiums collected remaining after subtracting the sum of 12 percent[6] of the premiums to be retained by Republic for overhead and profit, the 40-percent guaranteed commission previously paid, the net refunds made, losses paid, and unpaid claims outstanding. Any deficit resulting would be accumulated and charged against future contingent commissions, but would not affect the 40-percent guaranteed commission. Either party could terminate the agreement on 30 days' notice.

---

[5] During the years 1958 through 1962 an insurance company could write credit life insurance, on a decreasing-term basis, on the lives of finance company debtors in Indiana between the ages of 21 and 65 at a premium rate of not more than 50 cents per $100 of coverage per year, without taking into consideration the payment of commissions. Such a premium would be sufficient to cover death claims, which would amount to approximately 30 cents per $100 of coverage per year, administration expenses, and a profit margin.

[6] On Oct. 1, 1957, the agency agreement was amended to decrease the amount of premiums retained by Republic from 12 to 9½ percent, effective Oct. 1, 1957.

On the same date, January 4, 1954, Miller executed an assignment to Guardian of all commissions which might become due him under the agency agreement for a stated consideration of $1 "and other good and valuable considerations." On January 13, 1954, Miller, as vice president of Local Finance, wrote Republic, notifying it of the assignment and directing it to make commission checks under the agency agreement payable to Guardian.

From 1954 through 1962 the premium charged by Republic did not change. The finance companies' debtors paid the full premiums at the inception of the coverage out of the loan proceeds. In the event a loan was paid off in advance, in some instances the insurance was terminated and a refund of the premiums allocable to the unexpired term of the loan was made. If a loan was refinanced by a new loan, and new credit insurance was written on the new loan, the insurance premium paid on the old loan was either refunded or was credited toward the premium on the new insurance.

In each of the Indiana branch offices of the finance companies there was at least one employee who held a license as an Indiana life insurance agent for Republic. These employees signed the individual policies issued to the debtors. At first the licensees were office girls in the branch offices. However, in more recent years the managers of the branch offices have been the licensees. When a licensed employee was not available at a branch office, an employee of Guardian, also licensed as an agent by Republic, signed the policies. These employees did not receive any payments from Republic for acting as agents, nor did they receive additional pay from the finance companies.

Whenever a customer of one of the finance companies applied for a loan, the employee of the finance company interviewing the customer would discuss the availability of credit life insurance. If the customer agreed to take credit life insurance, both the loan papers and credit life insurance papers were prepared by the employees of the branch office. Any refunds of premiums paid for credit life insurance were handled by such branch office employees. In the event of the death of an insured debtor the branch office through which the policy was sold would complete a claim form, attach to it a death certificate, and forward this to Guardian or Beneficial which would check the computations and forward the form to Republic for payment.

Credit life insurance premiums received by each branch office of the finance companies were segregated by the branch office employees and deposited from time to time during each week in a separate bank account in the branch office city in the name of Guardian or Beneficial. Once a week the insurer's copies of the register sheets, evidencing the issuance of the insurance policies, were forwarded from the branch offices to either Guardian or Beneficial for transmission to Republic.

Guardian or Beneficial prepared a monthly report to Republic showing the amount of premiums collected on policies issued, the amount of premiums returned on policies canceled, and the amount of the difference. From such difference Guardian or Beneficial withheld the guaranteed 40-percent commission and transmitted a check for the remainder, together with the monthly report, to Republic.[7] The contingent commissions, which were paid every 3 months, were paid by Republic directly to Guardian or Beneficial.

The finance companies also placed and handled fire and casualty insurance written through Guardian and Beneficial, the paperwork being more extensive than that involved in handling credit life insurance, and received no compensation therefor from Guardian or Beneficial.

Under date of September 18, 1956, the insurance commissioner of the State of Indiana issued a directive to corporate insurance agencies, which stated, in pertinent part, as follows:

Whereas, there is some evidence to indicate that some corporate insurance agents have violated the law of Indiana which prohibits a corporate agency from acting as a life insurance agent; and

Whereas, the illegal device sometimes used to accomplish such violation is to employ an individual life licensee and to take an assignment of his commissions; and

Whereas, it is now declared that the assignment or transfer of life insurance commissions by a licensed life agent to a corporate insurance agency which employes [sic] such life agent is illegal; and

Whereas, it is now further declared to be illegal for any corporate agency officer or employee who is a licensed life agent to assign or transfer life insurance commissions to any corporation, foreign or domestic, which holds or controls the employer corporate agency;

Now, Therefore, it is directed that any corporate insurance agency which receives life insurance commissions by way of assignment or transfer, or in any other form, from or through an officer or employee who is a licensed life agent or which permits any employee or officer who is a licensed life agent to assign or transfer life insurance commissions in any form to any holding corporation which control the said corporate agency shall forthwith have its license as an agent in the State of Indiana revoked permanently.

This Directive does not condone or legalize any device not herein described which violates the aforesaid law prohibiting any corporate agency from acting as a life insurance agent.

In view of the above directive Republic was concerned as to the legality of the procedure by which commission payments were assigned by Miller to Guardian and Beneficial. It felt that the finance companies relied heavily upon it for advice as to procedures which would preclude any difficulty with any State agency. It accordingly brought this directive to the attention of Miller. Miller was concerned that the

[7] Although Miller executed no written assignment of commissions to Beneficial, commissions were received by Beneficial on credit insurance reported through it to Republic.

continuance of the assignment of commissions by him to Guardian and Beneficial might jeopardize the latter companies' insurance agency licenses. Republic was also concerned with the possibility that as a result of the assignment procedure its license as an insurance company might be suspended or revoked, and that Miller might lose his agency license. Various possible arrangements were considered by Republic and Local Finance, including the possibility of licensing the stockholders of Local Finance as agents and paying the commissions to them or the forming of a partnership consisting of such stockholders and the payment of commissions to the partnership. However, neither of these plans was feasible because there were too many shareholders of Local Finance, and no basic change in procedure was made at that time. The only change made at that time was that, beginning in November 1956 and continuing through June 30, 1958, Republic paid the contingent commissions by check made payable to Miller, instead of directly to Guardian or Beneficial, and Miller endorsed the checks over to Guardian and Beneficial. Guardian and Beneficial continued to withhold and retain the 40-percent guaranteed commissions.[8]

In the latter part of 1957 Republic suggested to Local Finance that it would be advisable to form a life insurance company to reinsure life insurance policies issued by Republic with respect to debtors of the finance companies. Its primary purpose in recommending the reinsurance procedure was to retain the credit life insurance business generated by the finance companies and at the same time avoid any possible violation of Indiana law with respect to the payment of commissions. Under such an arrangement Republic would continue to retain a portion of the premiums but would shift the mortality risks to the reinsurer.

After discussions among the directors of Local Finance and Guardian and officials of Republic, it was decided that such a life insurance company should be formed, but Local Finance's attorney advised that such company should not be owned by Local Finance. It was also decided that since Guardian and its subsidiary, Beneficial, had been receiving the commissions derived from the credit life insurance sold to the debtors of the finance companies, the stockholders of Guardian should be offered the opportunity to become the shareholders of the new insurance company.

Thereafter on March 18, 1958, there was incorporated under the laws of the State of Arizona a corporation under the name of Grand National Life Insurance Co. (hereinafter called National). The new insurance company was incorporated under Arizona law because that State permitted low minimum capitalization. On June 25, 1958, National obtained from the State of Arizona a certificate of authority as

---

[8] Miller did not report any of the commissions on his Federal income tax returns. Such commissions were reported as part of the gross income of Guardian and Beneficial.

a life insurance company. It issued 661 shares of stock (par value of $40 per share) at a price of $60 per share (a total of $39,660, representing $26,440 of paid-in capital and $13,220 of paid-in surplus). Each stockholder of Guardian was entitled to the same number of shares of National stock as was held by him in Guardian. The shareholders of Guardian acquired 655 of the 661 issued and outstanding shares of National. Miller, who was not a stockholder of Guardian, acquired the other 6 shares. The stockholders of Guardian paid for their stock in National in cash. A special dividend of $40 per share was paid by Guardian in order that its stockholders might avail themselves of the opportunity of acquiring such stock.

On July 21, 1958, National and Republic entered into an agreement entitled "Reinsurance Treaty No. 1," whereby National assumed Republic's liability for losses on credit life insurance written by Republic on or after July 1, 1958, on the lives of debtors of the finance companies. Such agreement provided in part as follows:

## ARTICLE II

Within twenty (20) days after the receipt by OLD REPUBLIC of any premium paid by or on behalf of policy holders for said policies, OLD REPUBLIC shall pay to GRAND NATIONAL a premium equal to ninety and one-half percent (90½%) of the total premium received by OLD REPUBLIC on said policies issued in the previous month.

## ARTICLE III

Together with each payment of premium, OLD REPUBLIC shall furnish to GRAND NATIONAL a statement giving the following information for the preceding month:

1. The total premiums on all said policies written during the preceding month.
2. The total premiums returned on policies surrendered for cancellation during the said month.
3. Life Insurance Account Number of Policies and amount of insurance.

    a. Issued during the preceding month
    b. Surrendered for cancellation during said month
    c. Terminated by death during said month
    d. Expired during said month
    e. In force at the end of said month

4. Claims paid including allocated claim expenses (allocated claim expenses shall include all expenses incurred in handling, adjusting, or defending claims, excepting ordinary office expenses of OLD REPUBLIC and wages or salaries of employees of OLD REPUBLIC).

## ARTICLE IV

In remitting the premiums under Article II OLD REPUBLIC may deduct (a) ninety and one-half percent (90½%) of refunded premiums on said policies and (b) the amount of incurred losses as shown by the statement or OLD REPUBLIC may request separate reimbursement for such items by GRAND NATIONAL.

ARTICLE V

GRAND NATIONAL will maintain proper reserves against policies reinsured under this treaty, provided, such reserves shall in no event be less that $2.64 per $1,000.00 of reinsurance assumed by GRAND NATIONAL under this treaty.

\*    \*    \*    \*    \*    \*    \*

ARTICLE VII

The supervision and payment of all claims under said policies shall be handled by OLD REPUBLIC. The liability of GRAND NATIONAL shall follow the liability of OLD REPUBLIC in accordance with the terms and conditions of said policies.

The above contract was terminable by either party upon 60 days' notice. National maintained a separate corporate existence during all the years involved herein and was subject to regulation by the Department of Insurance of the State of Arizona. Its operations were confined to the reinsurance acquired under the treaty between it and Republic. A reinsurer ordinarily has no contractural relationship with the policyholders of the ceding insurer. National had no dealings with any of the debtors of the finance companies.

National's home office consisted of space in a room in an office occupied by an attorney, James Engdahl, in Phoenix, Ariz. National had two accounts in a Phoenix bank where cash and securities belonging to it were deposited by Engdahl. It had no claims department, underwriting department, or salaried employees except Engdahl, who acted as office manager and received $20 a month. Consulting actuaries in Chicago kept National's books of account, computed its reserves, and prepared its annual statements to the Arizona insurance department. During the years involved five of National's six directors were also five of the six directors of Local Finance and Guardian, and, except for 1 year, a majority of its officers also constituted a majority of the officers of those companies.

After the reinsurance arrangement went into effect on July 1, 1958, there was little or no change in the procedures followed in the sale and servicing of the credit insurance issued on the lives of the finance companies' debtors, as compared with the procedures which had been followed during the period from January 1954 to June 1958. Branch office employees of the finance companies, as agents of Republic, continued writing policies, collecting premiums and depositing them in the names of Guardian and Beneficial, making refunds, preparing necessary papers in the event of the death of an insured debtor, and making reports to Guardian and Beneficial. Guardian and Beneficial continued to check the computations received, file monthly reports to Republic, and transmit the amount of net premiums to Republic without, however, withholding any amount as commissions. After July 1, 1958, no commissions were paid to Miller, Guardian, Beneficial,

or any of the petitioners with respect to insurance written by Republic after June 30, 1958, on the lives of debtors of the finance companies.[9] After the execution of the reinsurance treaty Republic continued to handle the payment of death claims as before. It maintained a cash reserve fund, set up out of the net insurance premiums sent to it through Guardian and Beneficial, and paid the death claims out of such fund. From the net premiums received Republic each month deducted the death claims paid, the refunds made, and the 9.5 percent of premiums retained, and sent the balance directly to National.

During the 5 taxable years in question the total number of credit life insurance policies processed was 266,772. Neither Guardian, Beneficial, nor the finance companies had to hire additional employees, purchase extra equipment, or provide additional space to process the credit life insurance, but did incur additional costs for postage.[10]

In 1960 an accounting under the agency agreement was furnished by Republic to Miller showing that from May 1, 1954, until June 30, 1958, the net premiums (gross premiums less premium refunds) on credit life insurance policies covering the finance companies' debtors amounted to $581,687.38. The amount of guaranteed commissions and contingent commissions received by Guardian and Beneficial was $232,-674.96 and $94,306.98, respectively, or a total of $326,981.94, which amounted to about 56 percent of the net premiums. Out of the remaining $254,705.44 (about 44 percent of net premiums) Republic paid claims of $186,338.56 and expenses of $221.38 (or a total of $186,-559.94), and retained $68,145.50.

During the period from July 1, 1958, to December 31, 1962, the total net premiums (gross premiums less refunds) received by Republic on credit life insurance sold to the debtors of the finance companies amounted to $1,254,748. Of this amount Republic retained $119,201 (or 9.5 percent). Against the remaining $1,135,547 [11] (or 90.5 percent) to which National was entitled under the reinsurance agreement, there were chargeable claims costs in the total amount of $402,195.06 (or about 32.1 percent of net premiums). National also had operating expenses, such as rent, professional fees, etc., in the taxable years 1958 through 1962 in the respective amounts of $979.90, $1,652.49, $1,754.11, $1,841.70, and $2,563.32.

---

[9] The finance companies continued, as before, to place and handle fire and casualty insurance policies written through Guardian and Beneficial without receiving any payment therefor from those agencies.

[10] Taking into account a reasonable allocation of salaries paid by the finance companies, and the extra cost of postage incurred, the cost to the finance companies of selling and servicing the credit life insurance policies during the years 1958 through 1962 was about $60,000. On a similar basis the cost to Guardian and Beneficial of processing the credit life insurance policies over the period July 1, 1958, through Dec. 31, 1962, was about $11,000.

[11] This amount was accounted for by National on its annual statements of insurance operations as gross premiums on reinsurance received as follows: 1958 (from July 1), $113,504.47; 1959, $257,920.36; 1960, $261,834.67; 1961, $245,680.74; and 1962, $256,606.81.

During the taxable years 1958 through 1962 National paid dividends in the total amount of $267,044. For those years it and the petitioners filed separate income tax returns, reporting separate corporate incomes. National filed its returns as a life insurance company, reporting taxable income in the respective amounts of $27,088.12, $127,591.51, $211,794.02, $113,885.25, and $115,829.25. For those years it paid taxes in the respective amounts of $8,585.82, $47,532.03, $84,018.70, $53,-720.33, and $53,917.37.

National was subject to, and was under the supervision of, the Department of Insurance of Arizona. It was examined by that department for the period March 18, 1958, to December 31, 1962. The report of the examination contained no criticism of its operations.

The following tabulation shows, for each of the taxable years involved, the net credit life insurance premiums (gross premiums less refunds) received and deposited in the insurance premium bank accounts by each of the finance companies (and by some of the Local Finance's subsidiaries against whom no deficiencies were determined) and the amount thereof which Guardian and Beneficial each received:

| | 1958 | | 1959 | 1960 | 1961 | 1962 |
|---|---|---|---|---|---|---|
| | To 6/30/58 | From 7/1/58 | | | | |
| Local Finance Corp____ | $65,898.58 | $83,437.39 | $186,617.44 | $201,440.90 | $183,172.49 | $186,285.24 |
| Local Finance Co., Inc_ | 8,154.63 | 8,549.01 | 32,350.77 | 46,698.69 | 41,650.07 | 49,611.24 |
| Local Finance Co., Inc. of Gary_____ | 1,174.92 | 1,132.45 | 6,728.39 | 5,787.60 | 3,801.83 | 6,967.34 |
| Local Finance, Inc_____ | 4,215.98 | 4,445.12 | 12,900.60 | 16,946.53 | 12,199.77 | 15,798.65 |
| Local Finance Corp. of Danville_____ | ---------- | ---------- | 575.07 | 2,884.11 | 2,436.13 | 2,505.53 |
| Local Finance Corp. of Elkhart_____ | [2] 3,019.69 | [2] 3,498.58 | 6,245.41 | 6,198.37 | [2] 5,402.61 | [1] 4,467.03 |
| Local Finance Corp. of Gas City_____ | 1,165.82 | 1,372.05 | 3,530.67 | 3,718.96 | 2,961.89 | 2,724.77 |
| Local Finance Corp. of Rushville_____ | 1,158.64 | 1,578.27 | 3,513.39 | 4,627.95 | 4,024.10 | 4,463.23 |
| Local Finance Corp. of South Marion_____ | [2] 491.35 | [2] 667.26 | [2] 2,976.44 | 3,735.28 | 4,150.85 | 3,974.32 |
| Local Finance Corp. of Delphi [1]_____ | ---------- | ---------- | 657.61 | 1,986.58 | 1,873.87 | 2,356.56 |
| Local Finance Corp. of Kokomo [1]_____ | ---------- | ---------- | ---------- | ---------- | 1,801.61 | 2,240.97 |
| Local Finance Corp. of Monticello [1]_____ | ---------- | 814.19 | 1,997.18 | 2,283.92 | 2,348.45 | 2,385.32 |
| Local Finance Corp. of Muncie [1]_____ | ---------- | ---------- | ---------- | ---------- | 1,437.07 | 2,722.70 |
| Local Finance Corp. of Portage [1]_____ | ---------- | ---------- | ---------- | ---------- | 242.44 | 1,896.02 |
| Totals_____ | 85,279.61 | 105,494.32 | 258,092.97 | 296,308.89 | 267,503.18 | 288,398.92 |
| Guardian Agency, Inc__ | 54,184.69 | 69,049.29 | 176,466.82 | 203,453.87 | 186,795.86 | 197,084.85 |
| Beneficial Insurance Agency, Inc_____ | 31,094.92 | 36,445.03 | 81,626.15 | 92,855.02 | 80,707.32 | 91,314.07 |
| Totals_____ | 85,279.61 | 105,494.32 | 258,092.97 | 296,308.89 | 267,503.18 | 288,398.92 |

[1] Listed only for completeness. No deficiencies proposed.
[2] No deficiencies proposed for these taxable years.

In the notices of deficiency the respondent, relying upon sections 61, 269, and 482 of the Internal Revenue Code of 1954, allocated as income among Local Finance and its subsidiaries (including sub-

sidiaries not involved herein) 50 percent of the above net premiums handled by them in the taxable years 1958 through 1962. He also, alternatively, determined that 50 percent of the amount so handled during the period July 1 to December 31, 1958, and during 1959 through 1962 was allocable to Guardian and Beneficial. He made no allocation to Guardian and Beneficial with respect to the period January 1 to June 30, 1958, since those two companies had already reported as income commissions received during such period.

OPINION

Throughout the years in question herein the finance companies, in connection with the making of their small loans, made available to their debtors, on a voluntary basis, credit life insurance written by Republic, an unrelated insurance company, at a rate of $1 per year per $100 of coverage. Such rate was the rate commonly charged in the credit life insurance industry in Indiana. It was customary for insurance companies to pay a commission for the sales of such insurance and the rate of premium charged by Republic was fixed in an amount sufficient to provide for such commission.

During the period January 1 through June 30, 1958, the commissions on the credit life insurance sold to debtors of the finance companies were not paid directly to the finance companies. Rather, such commissions were paid pursuant to an agreement entered into between Republic and Don H. Miller, who was an officer of each of the finance companies. The agreement provided that Miller should act as agent for Republic and receive a fixed commission of 40 percent of net premiums (gross premiums less refunds) paid by debtors of the finance companies, that Republic should retain 9.5 percent of such net premiums to cover its overhead and profit, and that Miller should receive an additional contingent commission measured by the remainder of the net premiums after payment of all claims. Miller simultaneously executed an assignment of such commissions to Guardian, a corporation controlled by the same interests which controlled the finance companies. The commissions so assigned to Guardian (some of which were received by Guardian's subsidiary Beneficial) over the period from May 1, 1954, through June 30, 1958, amounted to about 56 percent of total net premiums.

After June 30, 1958, Republic continued to write the insurance on the lives of debtors of the finance companies, but no commissions, as such, were paid to Miller or any of the petitioners. Rather, Republic entered into an agreement with National, an insurance company organized under the laws of Arizona and controlled by the same interests which controlled the finance companies and Guardian, whereby National agreed to reinsure the risks and receive 90.5 percent of the net

premiums, Republic retaining 9.5 percent of net premiums. Over the period July 1, 1958, through December 31, 1962, the amount which National received, after provision for payment of claims, amounted to about 58.4 percent of the total net premiums. National also had some operating expenses but in relatively small amounts.

It is now the primary position of the respondent that a portion of the commission income received by Guardian and Beneficial during the period January 1 to June 30, 1958, and a portion of the reinsurance premiums received by National during the period July 1, 1958, to December 31, 1962, constituted compensation earned by the finance companies for selling and processing the credit life insurance, and should be allocated to them in proportion to the amount of insurance which each sold. The amounts allocated by him amount to 50 percent of the total net premiums throughout the taxable years 1958 through 1962. He relies upon both sections 61 [12] and 482 [13] of the Internal Revenue Code of 1954. He specifically disclaims any reliance upon section 269 of the Code.

The petitioners concede that the loans made by the finance companies created the market for the credit life insurance issued by Republic to their debtors and that the officers and directors of such finance companies "could to a certain extent control who would receive income from the insurance." They state, however, that under the Indiana loan laws under which the finance companies operated they were precluded

---

[12] Sec. 61 of the Code provides in part as follows:

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

[13] Sec. 482 of the Code provides as follows:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Sec. 1.482–1 of the Income Tax Regulations provides in part:

(b) *Scope and purpose.* (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

\* \* \* \* \* \* \*

(c) *Application.* Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

from receiving any monetary compensation from such insurance, and that they never did receive any of the compensation. They further state that their control over the disposition of the income was limited in that the insurance laws of the State of Indiana prohibited the payment of income in the form of commissions on life insurance to corporations. They further state that the procedures which they adopted were designed to assure that the finance companies would not receive any income from the insurance in violation of Indiana law, and that such procedures must be given effect in determining to whom any such income should be taxed. They therefore contend that the respondent's determination that there should be allocated to the finance companies a portion of the commissions paid during the period January 1 to June 30, 1958, and a portion of the reinsurance premiums paid during the period July 1, 1958, to December 31, 1958, and during the years 1959 through 1962 was unreasonable, arbitrary, and capricious, and should not be sustained.

At the outset it should be stated that there is no question that all the finance companies as well as Guardian, Beneficial, and National are owned or controlled by the same interests within the meaning of section 482. The respondent having determined that the allocations in question are necessary in order to prevent evasion of taxes or clearly to reflect the income of the finance companies, the burden of proof is upon the petitioners to prove that such allocations are erroneous. In *Grenada Industries, Inc.*, 17 T.C. 231, affd. (C.A. 5) 202 F. 2d 873, certiorari denied 343 U.S. 819, we stated with regard to section 45 of the Internal Revenue Code of 1939, predecessor to section 482 of the Internal Revenue Code of 1954:

It has been said many times that the Commissioner has considerable discretion in applying section 45, and that the determinations required of him under the statute must be sustained unless that discretion has been abused. Our review of those determinations is not *de novo*, and we may reverse them only where the taxpayer proves that they are unreasonable, arbitrary, or capricious. See, e.g., *G.U.R. Co.* v. *Commissioner*, (C.A. 7), 117 F. 2d 187, 189; *National Securities Corp.*, 46 B.T.A. 562, 564, affd. (C.A. 3) 137 F. 2d 600, 602, certiorari denied 320 U.S. 794; *Seminole Flavor Co.*, 4 T.C. at 1228.

See also *Spicer Theatre, Inc.*, 44 T.C. 198, affd. (C.A. 6) 346 F. 2d 704; *Pauline W. Ach*, 42 T.C. 114, affd. (C.A. 6) 358 F. 2d 342, certiorari denied 385 U.S. 899; and *Hamburgers York Road, Inc.*, 41 T.C. 821.

For reasons set forth hereinafter it is our conclusion that the respondent's determination was not unreasonable, arbitrary, or capricious and must be sustained.

Section 61 of the Code provides that gross income means all income from whatever source derived, including compensation for services, in-

cluding commissions. It is well established that compensation may be taxed to the earner, despite anticipatory arrangements in contracts designed to prevent such compensation when paid from vesting in the one who earned it (*Lucas* v. *Earl*, 281 U.S. 111) ; that the power to dispose of income is the equivalent of ownership of it and that the exercise of that power to procure the payment of income to another is the enjoyment and hence the realization of the income by him who exercises it (*Helvering* v. *Horst*, 311 U.S. 112) ; and that the taxing statutes are not so much concerned with the refinements of title as with the actual command over the income which is taxed and that it makes no difference that such command may be exercised through the creation of a new controlled interest or a subservient agency (*Griffiths* v. *Helvering*, 308 U.S. 355, and cases cited therein). In *Grenada Industries, Inc.*, *supra*, we stated that while undoubtedly the general provisions of the Internal Revenue Code are sufficient to charge the income to the one who actually earns it, in the case of organizations under common control the detailed provisions of section 45 of the 1939 Code (now section 482 of the 1954 Code) "explicitly authorized the commissioner to unscramble any such situation, so that income may be charged to the organization that earned it."

It is clear that throughout the taxable years involved herein the finance companies performed all the services in connection with the sale and servicing of the insurance. It was their employees who contacted the debtors with respect to the taking out of the insurance. They wrote the policies, collected the premiums and deposited them in bank accounts in the names of Guardian and Beneficial, made refunds, prepared the necessary papers in the event of the death of an insured, and made weekly reports to Guardian and Beneficial. The record shows that Guardian and Beneficial merely collated information prepared by the finance companies and forwarded such information, together with the net premiums (after deducting commissions in the period January 1 to June 30, 1958), to Republic. They did not act as agents of Republic in the sale of the credit life insurance and indeed could not, since under Indiana law corporations could not act as life insurance agents.

While individual employees of the finance companies, rather than the finance companies themselves, were designated as the authorized insurance agents of Republic, it is clear that they were not entitled to any compensation from Republic in their individual capacities for placing the insurance. During the period that commissions were payable to Miller under his contract with Republic, it is obvious that Miller was not acting on his own behalf in entering into the agreement with Republic, but on behalf of the finance companies, that he was not entitled to retain the commissions, and that his assignment of such commissions to Guardian was dictated by Local Finance on behalf

of itself and its subsidiary finance companies.[14] We think it must be concluded, therefore, that during the period January 1 to June 30, 1958, the finance companies earned, and controlled the disposition of, the commission income, and that Miller received the commission income as an agent for such finance companies, which exercised their power to dispose of such income by having Miller assign it to Guardian and Beneficial. The allocation of 50 percent of net premiums to them is not unreasonable in view of the fact that over the period from May 1, 1954, to June 30, 1958, the commissions actually paid amounted to about 56 percent of net premiums.

As pointed out above, commencing July 1, 1958, no commissions, as such, were paid by Republic to anyone with respect to credit life insurance issued to debtors of the finance companies. Instead, the interests controlling Local Finance and Guardian decided to set up National to reinsure the credit life insurance issued to such debtors. The rate charged by Republic, which, as stated above, included a built-in portion normally used to pay commissions for selling the insurance, did not change. Such rate had been sufficient to permit the payment of commissions equal to about 56 percent of net premiums collected by Republic during the period May 1, 1954, to June 30, 1958. There was no change in the procedures followed by the finance companies or Guardian and Beneficial or Republic in the sale of the credit insurance. The finance companies continued to sell and service the insurance as before, and Republic continued to retain the same proportion of net premiums, 9.5 percent, which it had retained in the period January 1 to July 1, 1958.

It is axiomatic that questions of taxation must be determined by viewing what was actually done, rather than the declared purpose of the participants, and that when applying the income tax laws regard must be had to matters of substance and not mere form. *Weiss* v. *Stearn*, 265 U.S. 242; and *John M. Rogers*, 44 T.C. 126, affd. (C.A. 9, 1965) 377 F. 2d 534. And, as stated in *Comtel Corporation* v. *Commissioner*, (C.A. 2) 376 F. 2d 291, "The Tax Court had the power—indeed the duty—to look to the substance" of the transaction. We think that, in substance, the arrangement made by Local Finance with Republic whereby Republic, instead of paying commissions as such, paid National 90.5 percent of net premiums as reinsurance premiums represented, in part, the exercise by the finance companies of the control they

---

[14] This is clearly established by the testimony of Miller. On cross examination he testified in part:

"Q. Why did you decide to give that money up by assigning it away?

"A. I think I would have to answer you this way: that had I not been willing to assign that commission away, I wouldn't have had the agreement to start with. I don't believe that the people that operate Local Finance Corporation would permit an employee to have income from business that they generate without assigning it some place. It's just impractical."

possessed over the disposition of the compensation they earned for selling and servicing the insurance.[15] That is to say, a portion of the reinsurance premiums received by National in reality constituted commission income which the finance companies had earned and which they gratuitously diverted to National. National performed no services in connection with the sale of the insurance. It is true that National was a bona fide insurance company, that it did assume liability for reinsurance of the policies written by Republic, and that it was entitled to compensation for assuming such reinsurance risk.[16] During the period July 1 to December 31, 1958, and during the taxable years 1959 through 1962 National received 90.5 percent of all net premiums and, after provision for all claims, still retained about 58.4 percent of all net premiums. The respondent allocated 50 percent of net premiums to the finance companies, leaving National about 8.4 percent. Here again, for reasons stated above, we think that the allocation of 50 percent of net premiums to the finance companies as compensation for selling and servicing the insurance is not unreasonable. And there is no evidence in the record to show that the approximately 8.4 percent of net premiums remaining with National after the respondent's allocation did not constitute adequate compensation for its reinsurance of the risks and the minimal expenses it incurred.

The petitioners cite, among other cases, *R. P. Crowley*, 34 T.C. 333; *Alabama-Georgia Syrup Company*, 36 T.C. 747, reversed on another issue (C.A. 5) 311 F. 2d 640; and *Campbell County State Bank, Inc.*, 37 T.C. 430, reversed on another issue (C.A. 8) 311 F. 2d 374, for the proposition that the exercise of control over who shall perform services giving rise to income does not justify attribution of the income to the controlling taxpayer. The principle established by those cases, however, has no application here with respect to compensation earned by the finance companies. The finance companies did not designate any other person to sell and service the insurance and thereby earn com-

[15] Arthur J. Cade, who was executive vice president of Republic during the years involved, testified:

"Q. * * * could you tell me, please, why it was that Old Republic did not seek to place the reinsurance with one of the existing reinsurance companies as opposed to setting up a whole new company?

"A. Yes, sir, there would have been nothing to reinsure.

"Q. Why would there had been nothing to reinsure?

"A. Well, the purpose of utilizing reinsurance here was to create—one of the purposes was to create a legal vehicle to enable us to pay compensation in connection with the procurement of the insurance. If we chose to reinsure some—with some unrelated reinsurance company that result would not have been possible and therefore, I see no reason why we would have kept getting the business."

He also testified that, as an alternative to reinsurance with National, consideration had been given to having the stockholders of Local Finance licensed as insurance agents, either individually or as a partnership, and having them receive the commissions directly, but that such approach was rejected as impractical due to the relatively large number of stockholders.

[16] While National's total capitalization upon its organization was less than $40,000, this apparently satisfied the insurance laws of Arizona.

mission income. They continued to sell and service the insurance and had the power, which they exercised, over the disposition of the compensation therefor. Of course National performed the service of reinsuring the risks and the compensation for that service may not be attributed to the finance companies. As pointed out above, the respondent's allocation leaves about 8.4 percent of net premiums as income to National, and there is no showing that such amount is not adequate compensation for the reinsurance. And it may be added that although Guardian and Beneficial continued to render incidental services in connection with the processing of the credit life insurance, this did not entitle them to any commission income. This service was rendered under a reciprocal arrangement whereby the finance companies placed and handled for those companies, free of charge, fire and casualty insurance.

The petitioners have shown that the arrangement prevailing in the period January 1 to June 30, 1958, whereby the commissions were paid to Miller instead of to the finance companies was adopted, upon advice of their attorney, in order to avoid violation, or possible violation, of the Indiana statutes under which they were licensed and which fixed the rates to be charged for loans, and that the reinsurance plan prevailing thereafter was adopted for the same reason and also to meet the requirement of Republic, which wanted to avoid violation of the Indiana statute which prohibited payment of life insurance commissions to corporations. They contend that tax avoidance or evasion was not the purpose. The respondent apparently does not question this. However, as pointed out by the respondent, his authority under section 482 is not limited to allocations necessary "to prevent evasion of taxes," but also includes allocations necessary "clearly to reflect the income" of commonly controlled organizations. We agree that establishment by the petitioners of a nontax motive for the procedures adopted is no answer to the respondent's determination that the allocations were necessary "clearly to reflect" the petitioners' income. In *Asiatic Petroleum Co., Ltd.*, 31 B.T.A. 1152, affd. (C.A. 2) 79 F. 2d 234, certiorari denied 296 U.S. 645, we stated:

attempted evasion is not the only situation described as proper for invoking section 45. Another is "in order * * * clearly to reflect the income of any of such trades or businesses."

And in *Dillard-Waltermire, Inc. v. Campbell*, (C.A. 5) 255 F. 2d 433, it was stated:

The appellant undertook to prove absence of a tax motive in order to negative the claim of tax evasion. Even satisfactory proof of a business reason * * * would not be an answer to the Commissioner's claimed right to make the allocation. The statute permits such allocation if the result more clearly reflects the true income of the related businesses. * * *

See also *Simon J. Murphy Co.*, 22 T.C. 1341, reversed on other grounds (C.A. 6) 231 F. 2d 639; *Eli Lilly & Co.* v. *United States*, (Ct. Cl.) 372 F. 2d 990; and sec. 1.482-1(c), Income Tax Regs. Since the finance companies performed all the work of selling and servicing the insurance and earned the right to compensation therefor and had the power of disposition over such income, we think it necessary to allocate such income to them in order clearly to reflect their income.

The petitioners insist, however, that the finance companies did not actually receive any commission income, that receipt of any such commissions would have violated the law of the State of Indiana, and that therefore no such commission income may be allocated and taxed to them.[17]

We find it unnecessary to determine whether direct receipt of the insurance commissions by the finance companies would have violated the Indiana Statutes under which they operated, namely, the Indiana Small Loan Act, the Indiana Retail Installment Sales Act, and the Indiana Industrial Loan and Investment Act.[18] Even if so, and even though the insurance laws of Indiana prohibited payment by a life insurance company of commissions to a corporation, we are of the opinion that the respondent is not foreclosed from allocating to the finance companies under section 482 of the Code the income which they earned and over which they exercised the power of disposition. It is well established that Congress establishes its own criteria for the application of tax statutes, that State law may control only when the Federal taxing act by express language or necessary implication makes its operation dependent upon State law, and that in the absence of language evidencing a different purpose, a tax statute should be interpreted so as to give a uniform application to a nationwide scheme of taxation. *Burnet* v. *Harmel*, 287 U.S. 103; *Lyeth* v. *Hoey*, 305 U.S. 188; *Commissioner* v. *Tower*, 327 U.S. 280; *Helvering* v. *Northwest Steel Rolling Mills, Inc.*, 311 U.S. 46; and *Walter I. Geer*, 28 T.C. 994.

As pointed out above, the exercise of the power to dispose of income and procure the payment thereof to another is, for Federal tax purposes, the equivalent of realization of the income. Clearly, the broad

---

[17] The petitioners cite in this connection *Nichols Loan Corporation of Terre Haute*, T.C. Memo. 1962-149, reversed on another issue (C.A. 7) 321 F. 2d 905; *Campbell County State Bank, Inc.* v. *Commissioner*, 37 T.C. 430, reversed on another issue (C.A. 8) 311 F. 2d 374; *First Security Bank* v. *United States*, (D. Mont.) 213 F. Supp. 362, affd. (C.A. 9) 334 F. 2d 120; and *L. E. Shunk Latex Products, Inc.*, 18 T.C. 940.

[18] Although the respondent has not specifically conceded the petitioners' contention in this respect, he presented no argument with respect thereto. No authority has been cited by the parties upon this question. The only case which we have found which deals with the legality of receipt of commissions by a small loan company is *State* v. *Bankers Finance Corporation*, (Del. 1942) 26 Atl. 2d 220. It was there held that the receipt of commissions by a small loan company on insurance on its debtors' collateral did not constitute an "additional charge of any kind" under the Delaware Small Loan Act, where the insurance premium rate was not in excess of the standard rate and the purchase of the insurance was on a voluntary basis.

language of section 482 of the Code permits the allocation to a controlled organization of income which it does not actually receive where such allocation is necessary in order clearly to reflect the income of such organization, and there is no indication that Congress intended that the application of that section (or section 61) should be dependent upon State law. Under the circumstances here presented we cannot conclude that the respondent acted unreasonably in making the allocation to the finance companies.

We have carefully examined the cases cited by the petitioners, set forth in footnote 17, *supra*, but conclude that they do not support the proposition that, because the finance companies did not actually receive the commission income and because receipt thereof would have, or might have, violated Indiana law, no such income may be allocated and taxed to them.

In *Nichols Loan Corporation of Terre Haute*, T.C. Memo. 1962–149, we held that the petitioners (Indiana corporations) which conducted loan businesses under the Indiana Small Loan Act were not taxable on credit life insurance commissions, pointing out that they did not intend to, and did not in fact, act as insurance agents in violation of Indiana law. However, the facts there were quite different from those in the instant case. There the individuals who were stockholders and officers of the corporations had been engaged, prior to the organization of the corporations, in both the business of making loans and the insurance agency business, in partnerships. When the corporations were set up they transferred only the loan businesses to the corporations, and retained the insurance agency businesses. They, in the conduct of their insurance agency business, sold the insurance on the lives of the debtors of the corporations, and received in their own right the commissions. This was the decisive factor in that case. The corporations had no right to the commissions or any power over the disposition thereof. In the instant case the individual officers and employees of the finance companies had no right to commission income or the power to dispose of it. The finance companies earned compensation for selling and servicing the insurance and had the power to dispose of it, which power they exercised in favor of other commonly controlled corporations which had not acted as insurance agents in the sale of the insurance and who did nothing to earn such compensation. In short, there was no person other than the finance companies who was entitled to such compensation or who had the right to dispose of it. It may be added that the application of section 482 was not an issue in the *Nichols* case.

In *Campbell County State Bank, Inc.*, v. *Commissioner*, 37 T.C. 430, the stockholders of a bank formed a partnership to engage in a general insurance agency business, rather than use their bank for that purpose because State law forbade banks to engage in such business.

The Commissioner attacked the separate existence of the insurance agency as a sham and attributed its income to the bank. We there held that the separate identity of the insurance agency should be recognized. We stated that the State statute was relevant only to show the existence of some business purpose (other than the saving of taxes) for conducting the insurance through an entity other than the bank. It may be added that we there also stated that the income earned by the insurance agency could not be allocated to the bank under section 482. In that case it was the fact that the bank did not earn the income, and not the prohibition of State law, which precluded the application of section 482.

*First Security Bank* v. *United States*, 213 F. Supp. 362 (D.C. Mont.), involved a similar situation and a similar holding, except that, as pointed out by the Court of Appeals for the Ninth Circuit, in affirming the lower court, section 482 was not in issue.

In *L. E. Shunk Latex Products, Inc.*, 18 T.C. 940, the taxpayers were two manufacturing corporations which, together with a partnership to which they sold their products, were owned or controlled by the same interests. In January 1942 the partnership increased its prices for the goods sold, but the taxpayers did not make an increase in their prices to the partnership. Later the Office of Price Administration issued certain wartime price regulations which permitted the increase in prices made by the partnership, but prohibited any increase in prices charged by the taxpayers on their manufactured products above the prices existing at December 1, 1941. The prices that the taxpayers had charged the partnership at that date had been fixed in arm's-length negotiations. We there held that section 45 of the Internal Revenue Code of 1939 did not authorize the Commissioner to allocate any of the partnership's income to the taxpayers. We there stated that the OPA regulations prohibited taxpayers from receiving the very income sought to be attributed to them and that the Commissioner had no authority to attribute to them income which they could not have received. This statement, however, must be considered in the light of the situation there prevailing. The price charged was not due to the control element. The taxpayers could not legally charge any greater amount for their goods, whether to a controlled organization or anyone else, and in fact did not do so. They therefore had no income over which they could exercise the power of disposition. The income which the respondent attempted to allocate to them was not their income, but that earned by the partnership and owned by it.

On brief the petitioners state that the respondent has not reduced the income of National as a correlative adjustment to the income he proposes to tax to the finance company petitioners and contend that, as shown by the respondent's own pronouncement contained in a technical information release, T.I.R. 838, August 2, 1966 (published

in 7 C.C.H. 1966 Stand. Fed. Tax Rep. par. 6681; 6 P.H. 1966 Fed. Tax Serv. par. 54998), he has not complied with the requirements of section 482, and therefore should not be permitted to tax any of such income to any of the petitioners. We cannot agree. In such T.I.R. the respondent, by referring to certain proposed regulations, in effect took the position that any correlative adjustment need not be made until the correctness of his allocation under section 482 has been conceded or finally determined. While it is obvious that there should be a correlative adjustment to National's income, that company is not before us. The record does show, however, that National filed protective claims for refund.

In view of the fact that we have sustained the respondent's allocation of 50 percent of net premiums to the finance companies, it necessarily follows, as agreed by the parties in the stipulation of facts, that a corresponding adjustment must be made in the taxable income of Guardian and Beneficial for the period January 1 to June 30, 1958, they having reported the commissions as their income. It also necessarily follows, as conceded by the respondent, that his alternative determination allocating 50 percent of net premiums to Guardian and Beneficial for the period July 1, 1958, to December 31, 1958, and for the taxable years 1959 through 1962 must be disapproved.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

FORRESTER, *J.*, concurs in the result.

---

TANNENWALD, *J.*, concurring: Petitioners herein would have us posit our decision on certain purportedly abiding principles which they claim prior cases have made into articles of faith, i.e., that a taxpayer may not be taxed on income which he cannot legally claim as his own, and that merely providing the source of income or the mere ability to designate who performs the income-producing services are insufficient touchstones of taxability. An examination of the decided cases, however, reveals that these so-called articles of faith represent no more than semantic rationalizations designed to sustain a result dictated by the particular factual situation involved. I would not, as the majority appears to have done, indulge in further propagation and thereby add to the confusion with which the decided cases already abound. I take my cue from the admonition of Mr. Justice Holmes that "general propositions do not decide concrete cases" (see *Lochner* v. *New York*, 198 U.S. 45, 76 (1905) (dissenting opinion)) and would reach the majority result simply by answering these essentially factual questions:

(1) Did the approximately 8.4 percent of the payments received by National from Republic and not allocated by respondent to petitioners constitute adequate compensation for the reinsurance risk? I think it did. Petitioners offered no evidence to dispute the adequacy of

the 8.4 percent in this regard. Indeed, the testimony of Arthur J. Cade, the former executive vice president of Republic, set forth in footnote 15 to the majority opinion, points to the likelihood that no reinsurance risk compensation whatsoever was intended. National had no claims or underwriting department or salaried employees except its attorney who acted as office manager and received $20 per month. I think it is clear therefore that the allocated payments in excess of 8.4 percent were commissions paid by Republic as compensation for services rendered with respect to credit life insurance business.

(2) Who performed the services which were thus compensated? Clearly, petitioners did. Their employees informed the customers of the availability of credit life insurance, prepared the papers relating to such insurance, handled refunds of premiums, completed the claim form in the event of death, and, after attaching a death certificate, forwarded the same to Guardian or Beneficial. Petitioners' employees received the premiums, segregated them, and deposited them in bank accounts in the branch office cities in the name of Guardian or Beneficial. Each week, petitioners' employees forwarded the insurer's copies of the register sheets, evidencing the issuance of the policies, to either Guardian or Beneficial for transmission to Republic. Guardian and Beneficial were simply conduits for forwarding to Republic the papers prepared by petitioners; additionally, they prepared and sent to Republic a monthly report showing the amount of premiums collected, the amount of premiums refunded, and the net difference.

To be sure, at least one employee of each Indiana branch office of petitioners held a license as an Indiana life insurance agent for Republic. But, as far as the record reveals, this had no more than symbolic significance. Petitioners hired, controlled, and paid all the branch office employees involved in the handling of the credit life insurance; no part of the expenses relating to such employees or the services they performed was charged to Republic, National, Guardian, or Beneficial. Petitioners' argument that such services on the part of its employees were negligible is beside the point. It may well be that no significant services *on the part of anyone* were required in connection with the writing of credit life insurance activities. But, if such were the case, it would not follow that the income should remain with other parties, who did nothing, as against allocating such income to the petitioners, whose activities certainly produced the business.

The factual situation outlined is equally applicable to respondent's allocation to petitioners of 50 percent of the net premiums paid to Guardian and Beneficial during the period January 1 to June 30, 1958, except that the possibility of identifying such payments as compensation for the risk of reinsurance is concededly not involved.[1]

---

[1] The fact that respondent made no allocation from National to Guardian or Beneficial in respect of the post-1958 period is beside the point. It is entirely possible that respondent was overly generous in not allocating *all* of the 1958 payments to petitioners.

Under the foregoing circumstances, it cannot be gainsaid that petitioners performed the services for which the payments involved herein were made. Petitioners cannot avoid taxability on the allocated amounts simply because the payments were made to someone else. In none of the cases relied upon by petitioners, with one possible exception, did the taxpayer in fact perform the services for which the allocated payments were made. In each, as petitioners themselves point out on brief, the taxpayer was simply in "the position to have performed the services for which the income was paid but *chose not to do so.*" (Emphasis added.) At best, those cases stand for the proposition that the mere *possibility of performance* of services by the taxpayer does not sustain an allocation of payment by respondent. They do not hold that taxability cannot be imposed where the taxpayer *actually performs* the services. The possible exception is *Nichols Loan Corporation of Terre Haute*, T.C. Memo. 1962–149, reversed on other grounds 321 F. 2d 905 (C.A. 7, 1963). But it is significant that neither in the opinion of this Court nor that of the Court of Appeals was there any reference to section 482 and the opinion of this Court makes clear that its decision was based on a "consideration of all the evidence." In any event, if that case can be viewed as requiring a contrary result herein, I would not follow it.

Nor can petitioners take shelter from the application of section 482 simply because a violation of Indiana law was the genesis of the business purpose of the arrangements herein. I will assume, for the purposes of argument, that direct receipt of the commissions by petitioners would have violated Indiana law and also that the actual arrangements satisfied the requirements of that law, although the record herein is not clear as to whether either of these conditions existed. Section 482 empowers respondent to allocate "in order clearly to reflect income." The presence of actual receipt of, or the legal right to receive or obtain, the allocated income is not always a necessary prerequisite to the application of that section. *L. E. Shunk Latex Products, Inc.*, 18 T.C. 940 (1952), does not hold otherwise. In that case, the taxpayer was caught in a vise imposed by the OPA regulations. The hard fact was that, by virtue of those regulations, it could not have charged any higher price to a wholly independent distributor than it did to the distributor which was under common control with it.[2] In short, the OPA regulations conclusively established an "arm's-length" price which the taxpayer actually charged its distributor. The taxpayer had no other choice except to forfeit the economic benefit, which respondent sought to tax, by selling its manufactured goods to an independent distributor. We were not disposed to impose such forfeiture and therefore held that, under such circumstances, section 482 could not properly

---

[2] We carefully pointed out that there was no evidence that the taxpayer could have obtained an upward modification of the prices established by the OPA regulations.

be applied. In the instant case, the Indiana law left petitioners with a clear-cut alternative. The way was open to them to adopt arrangements under which National, Guardian, and Beneficial rather than petitioners themselves would, in fact, perform the services for which Republic made payment in the allocated amounts. Under such arrangements, petitioners could have continued to receive the same economic benefit.

It does not follow, as petitioners seem to assume, that, because they may have put sufficient flesh on the bones of National, Guardian, and Beneficial to avoid problems under Indiana law, respondent is necessarily precluded from establishing different poundage requirements to support his allocation under section 482. At the very least, petitioners, as they concede, had the burden of proving that respondent was arbitrary in so doing. In this respect, they have, in my opinion, failed to carry the day.

Since the respondent's action can be sustained under section 482, I see no purpose to be served by discussing the applicability of section 61. Indeed, I see good reason for not entering the mare's nest of the decided cases under that section. See Teschner, "Anticipation of Income," 41 Ind. L. J. 587 (1966) ; cf. Eustice, "Contract Rights, Capital Gain, and Assignment of Income—The Ferrer Case," 20 Tax L. Rev. 1 (1964).

Dawson, J., agrees with this concurring opinion.

---

Drennen, J., dissenting: I am not sure that I would agree with the majority, as Judge Fay has done, that National was a viable business entity and not a sham. But if National's vitality is assumed, I agree with Judge Fay that the taxation of the major portion of the reinsurance income to the petitioners here is contrary to the previously decided cases cited in his opinion and is also difficult to make coexist with L. E. Shunk Latex Products, Inc., 18 T.C. 940.

I wish to add that I disagree with the approach taken by the concurring opinion of Judge Tannenwald wherein he concludes that the 8.4 percent of the payments received by National from Republic and not allocated by respondent to petitioners constituted adequate compensation for the reinsurance risk, and the balance represented commissions paid by Republic as compensation for services rendered with respect to the credit life insurance business. I do not believe it is the business of this Court to determine what is a reasonable fee for reinsuring this type of risk. That would be a matter for the State insurance commission to decide. If the fee allowed was higher than the risk warranted, in order to pay commissions, then those commissions would be payable by National not Republic. If the premiums chargeable and charged for this type insurance were more than adequate to cover

the cost of writing it and the risk involved, I do not believe either the Commissioner or this Court should attempt to allocate the excess to the cost of performing the services of writing the insurance rather than to the risk involved, which National assumed.

FAY, J., dissenting: With all deference, I am unable to agree with the conclusion reached by the majority of the Court. It is my opinion that the rationale relied upon by the majority is contrary to existing case law and an unwarranted application of the statute.

The majority finds as a fact that National, the reinsurer, was a bona fide insurance company. It holds that National assumed liability for the reinsurance of the policies written by Republic and that it could validly retain part of the total premium. We agree with the majority that National was a viable business entity and not a sham.

The majority holds that a portion of the commission income received by Guardian and Beneficial during the period January 1 to June 30, 1958, and a portion of the reinsurance premiums received by National during the period July 1, 1958, to December 31, 1962, constituted compensation earned by the finance companies for selling and processing the credit life insurance. It further holds that petitioners exercised the power to dispose of such income by diverting it first to Guardian and Beneficial and later to National, rather than receiving it themselves. It concludes that, under section 61, this income is properly taxable to petitioners despite the actual receipt by others.

The majority relies principally upon the services performed by the petitioners in connection with the sale and servicing of the insurance. It lists the following facts as being descriptive of these services: Petitioners wrote the policies, collected premiums, deposited them in bank accounts in the names of Guardian and Beneficial, made refunds, prepared the necessary papers in the event of the death of the insured, and made weekly reports to Guardian and Beneficial. For the years 1958 through 1962, the cost to the petitioners of the services was approximately $60,000. Guardian and Beneficial prepared monthly reports of the collated information and forwarded these reports together with the net premiums to Republic. The cost of this processing service to Guardian and Beneficial for the period July 1, 1958, through December 31, 1962, was approximately $11,000.

Though petitioners' activities in filing death claims were consistent with their status as beneficiaries under the policies, it is true that they have, along with Guardian and Beneficial, performed some services in connection with the sale and servicing of these policies. I do not agree, however, that these activities can result in the allocation urged by the respondent.

I think the case at bar is controlled by such cases as *Nichols Loan Corporation of Terre Haute*, T.C. Memo. 1962–149, reversed on other grounds 321 F. 2d 905 (C.A. 7, 1963) ; and *Campbell County State Bank, Inc.*, 37 T.C. 430 (1961), reversed and remanded on another issue 311 F. 2d 374 (C.A. 8, 1963). See also *Jaeger Motor Car Co.* v. *Commissioner*, 284 F. 2d 127 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 365 U.S. 860 (1961), *Moke Epstein, Inc.*, 29 T.C. 1005 (1958) ; and *Ray Waits Motors* v. *United States*, 145 F. Supp. 269 (E.D. S.C. 1956).

In both *Nichols* and *Campbell*, the employees of several loan corporations and of a bank provided services similar to those provided by the petitioners herein in selling and servicing insurance policies. No compensation was received by them for so doing. In the *Nichols* case the total payments went to one of the loan corporations' shareholders and was divided by him with the other shareholders. In *Campbell* the payments went to a partnership formed by the bank shareholders. In both cases none of the shareholders actually performed any services, nor did they compensate the lending institutions for any space or materials or expenses of the solicitation or processing service. I am aware that in the *Campbell* case the partnership ostensibly "hired" three employees but we found therein that they were persons who were already bank employees and who were treated as having been compensated wholly by the bank for withholding purposes. In both these cases we held that none of the income of the individual shareholders in *Nichols* or the partnership in *Campbell* was taxable to the loan corporations or to the bank, respectively. This Court in the *Campbell* case rejected respondent's position that the partnership was a sham and held that the bank did not earn the income and in the *Nichols* case rejected respondent's general argument that the income was chargeable to the loan companies. In this connection, I would point out that the Court of Appeals for the Seventh Circuit in reversing on another issue in *Nichols* held that the expenses of the loan companies were so minimal regarding the insurance operation as not to require any reallocation of the companies' expense deductions. In this light it appears strange that the majority now uses the same type of activity on the part of the finance companies as a basis to allocate to them 50 percent of the net premiums.

I can find no meaningful distinction between the actual services in these two cases and the case at bar. Therefore, I am of the opinion that to hold, as the majority does here, in the absence of a finding that the reinsurer, National, was a sham, that the income is not properly taxable to a corporation set up by a majority of the finance companies' shareholders is irreconcilable with our earlier holdings that the same type of income is properly taxable directly to the loan corporations' shareholders (*Nichols*) or to a partnership made up of bank shareholders

(*Campbell*). I cannot conceive that the fact that in *Nichols* and *Campbell* what is essentially the profit in the credit insurance operation was passed ultimately to shareholders of the loan companies or bank in the form of a commission operates to distinguish it from this case where the profit vehicle takes the form of a reinsurance premium.

Even assuming *arguendo* as the majority concludes, that some part of the income is taxable to those who perform the services, I cannot understand how it allocates all of the income to the finance companies thereby ignoring the fact that services were also performed by Guardian and Beneficial. I am of the opinion that such a conclusion is not consistent with the rationale upon which it is based.

The majority opinion also relies upon section 482 for support in allocating the income to petitioners in order to clearly reflect income. The premise of this approach is the previously reached conclusion that petitioners have earned the income by the performance of various services and have exercised a power of disposition over this income to channel it to the reinsurance company. The majority would negate the application of the *Nichols* and *Campbell* cases by noting that therein the loan companies and the bank did not "earn" the income. I cannot agree. The same criteria used by the majority to conclude that the petitioners herein earned the income were present in both the earlier cases. In neither of these earlier cases were services performed by the stockholders who actually received the money. Indeed, it would appear that the case before us contains stronger facts in this regard than either *Nichols* or *Campbell* since National seems possessed of a more readily apparent business operation in connection with the profit from the insurance, i.e., reinsuring the risk, than was possessed by either of the stockholder groups in the earlier cases which did no more than receive the income. I again am of the opinion that the majority's rationale is not reconcilable with our earlier decisions in this area.

Unable to distinguish this case from our earlier decisions, I am left with the curious result that where employees of lending institutions perform services regarding credit life insurance the stockholders of those institutions may validly take a profit from the insurance business by setting up a partnership to receive it but may not validly take, in effect, the same profit by setting up a legitimate insurance company to reinsure the risk.

I am aware of the favorable tax treatment which may be available in some circumstances to insurance companies. Because of this treatment, favorable tax consequences might inure to the petitioners if the Court were to follow *Nichols* and *Campbell* in the case at bar. I do not, however, think that the case law permits us to prevent this result. I do not contend that section 482 is inapplicable to insurance companies. I do contend that, as interpreted by existing case law, it does not apply to these facts. If favorable tax treatment is to be prevented in such

cases as this, it is in my opinion up to Congress to do so. See the excellent discussion of the boundary between legislative and judicial jurisdiction in this area in *Alinco Life Insurance Co.* v. *United States*, 373 F. 2d 336 (Ct. Cl. 1967), which held that section 269 did not authorize the Commissioner to disallow the benefits of the special tax treatment of life insurance companies to a reinsurer controlled by the lending institution. It is particularly noteworthy in this context to consider the past history of respondent's attempts to attack various business-connected insurance arrangements. Respondent has pitched his arguments on sections 61, 269, 482, and a general argument that income was properly taxable to a lending institution rather than a controlled reinsurer or the shareholders of the lending institution as partners of an insurance agency. All these approaches have been repeatedly rejected by this and other Courts. See cases cited, *supra*. The only case in which a court has held that this type of arrangement gives rise to income, taxable to the lending institution, is *Bank of Kimball* v. *United States*, 200 F. Supp. 638 (D.S.Dak. 1962), in which the District of Court held, because no valid partnership had been formed, that commissions were taxable to the bank rather than to the alleged partnership comprised of its stockholders. The court, however, noted that for later years, after a formal partnership agreement had been signed by the stockholders, the Government had conceded that the income thereafter was properly taxable to it and not to the bank.